TIMOTHY R. E. KEENEY, COMMISSIONER OF
ENVIRONMENTAL PROTECTION *v.*
TOWN OF OLD SAYBROOK
(15205)

Peters, C. J., and Callahan, Berdon, Norcott and Katz, Js.

Argued January 17—officially released May 21, 1996

*Jeremiah Donovan*, with whom was *Terry Donovan*, for the appellant (defendant).

*Richard F. Webb*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (plaintiff).

PETERS, C. J. The principal issue in this appeal is whether the department of environmental protection (department) appropriately directed a town to construct a regional wastewater treatment facility in order to abate long-standing local pollution of the Connecticut River. The plaintiff, Timothy R. E. Keeney, commissioner of environmental protection (commissioner), brought suit in eight counts for declaratory and injunctive relief and for civil penalties against the defendant, the town of Old Saybrook, for allegedly violating four orders to abate pollution, and consequently violating General Statutes §§ 22a-436, 22a-427, 22a-458 and 22a-14 et seq. The trial court rendered judgment for the commissioner on all counts and issued a permanent injunction that requires Old Saybrook to comply with all outstanding environmental orders. In addition, the trial court imposed a civil penalty of $98,060 because of Old Saybrook's past failure to comply with the four orders. Old Saybrook appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court in part and remand for further articulation.

The trial court found the following facts documenting a long-standing history of water pollution in Old Saybrook. In 1981, Malcolm Pirnie Engineers issued a report (Pirnie report) disclosing that a large number of individual residential septic systems in Old Saybrook were discharging improperly renovated wastewater or were completely failing, resulting in pollution of the groundwater and the Connecticut River. Similar problems in the towns of Westbrook and Clinton were documented by Malcolm Pirnie Engineers in separate studies. Many of these septic systems could not be repaired either because the groundwater table was too high or because the residential lots on which they were

located were too small. Old Saybrook never questioned the validity of the findings of the Pirnie report.

In accordance with the recommendations of the Pirnie report, the department, with the assistance of Old Saybrook and other coastal towns, developed a "sewer avoidance program" to respond to the problems of the failing septic systems. The commissioner issued three orders against Old Saybrook for implementation of the sewer avoidance program.[1] Orders 3109 and 3110 require Old Saybrook to implement a program to monitor and inspect the septic systems, to verify compliance with the sewer avoidance program to the commissioner on a stated schedule and to send annual reports to the commissioner. Order 3111 requires Old Saybrook to implement a program to maintain the septic systems and to verify compliance with the program to the commissioner on a stated schedule. Old Saybrook impliedly agreed to the terms of these orders by not taking a timely appeal to challenge any of them.

In 1985, the commissioner issued order 4116,[2] which required Old Saybrook and the town of Westbrook to conduct a regional study, for the commissioner's approval, that would recommend solutions to the regional wastewater management problems that failing septic systems were causing in these towns. After the commissioner removed a requirement that Old Saybrook implement any recommendations to be made in the study from order 4116, Old Saybrook took no appeal from its remaining terms.

In accordance with order 4116, Old Saybrook hired engineering consultant Hayden-Wegman to conduct the required study, which, pursuant to a request from the town of Clinton, included that town as well. In March,

---

[1] Similar orders were issued against the towns of Westbrook and Clinton.

[2] The commissioner does not claim that Old Saybrook has failed to comply with the original order 4116.

1989, Hayden-Wegman issued a final report, entitled the "Hayden-Wegman Old Saybrook-Westbrook Joint Wastewater Management Study Final Draft, revised March 1989" (Hayden-Wegman report). The Hayden-Wegman report confirmed the problem of failing septic systems, and recommended the construction of a regional wastewater treatment facility that would discharge wastewater into the Connecticut River. Old Saybrook never questioned the validity of the findings of the Hayden-Wegman report.

On October 20, 1989, after a series of communications and meetings between officials of the department, Old Saybrook officials and others, the commissioner signed modified order 4116. The modified order required Old Saybrook to implement the recommendations contained in the Hayden-Wegman report by having built a regional wastewater treatment facility that would service the towns of Old Saybrook, Westbrook and Clinton. Although Old Saybrook would be responsible for coordinating the design, construction and funding of the facility, all three towns would share in its costs. On October 24, 1989, modified order 4116 was hand-delivered to Barbara Maynard, the first selectman of Old Saybrook. Additional facts will be set forth as they become relevant to the issues before us.

The commissioner brought suit in the Superior Court for the judicial district of Hartford-New Britain seeking declaratory relief, injunctive relief and civil penalties against Old Saybrook. In counts one, two, three and eight of the substitute amended complaint, the commissioner alleged that Old Saybrook had violated General Statutes § 22a-428[3] by failing to comply with orders

---

[3] General Statutes § 22a-428 provides in relevant part: "Orders to municipalities to abate pollution. If the commissioner finds that any municipality is causing pollution of the waters of the state, or that a community pollution problem exists, or that pollution by a municipality or a community pollution problem can reasonably be anticipated in the future, he may issue to the municipality an order to abate pollution. . . ."

3109, 3110, 3111 and modified order 4116. In addition, in count eight, the complaint alleged that the legislative body of Old Saybrook had violated General Statutes § 22a-458,[4] by failing to authorize the necessary funds to comply with modified order 4116. In counts four and six, the complaint alleged that Old Saybrook had

The commissioner may cause a suit to be brought for injunctive relief or for penalties pursuant to General Statutes §§ 22a-435 and 22a-438.

General Statutes § 22a-435 provides in relevant part: "Injunction. If any person or municipality fails to comply with any order to abate pollution, or any part thereof, issued pursuant to the provisions of section 22a-428, 22a-431 or 22a-433, and no request for a hearing on such order or appeal therefrom is pending and the time for making such request or taking such appeal has expired, the commissioner may request the attorney general to bring an action in the superior court for the judicial district of Hartford-New Britain to enjoin such person or municipality from maintaining such pollution and to comply fully with such order or any part thereof. . . ."

General Statutes § 22a-438 provides in relevant part: "Forfeiture for violations. Penalties. (a) Any person who or municipality which violates any provision of this chapter, or section 22a-6 or 22a-7 shall be assessed a civil penalty not to exceed twenty-five thousand dollars, to be fixed by the court, for each offense. Each violation shall be a separate and distinct offense and, in case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense. The attorney general, upon complaint of the commissioner, shall institute a civil action in the superior court for the judicial district of Hartford-New Britain to recover such penalty. In determining the amount of any penalty assessed under this subsection, the court may consider the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court. The court shall consider the status of a person or municipality as a persistent violator. The provisions of this section concerning a continuing violation shall not apply to a person or municipality during the time when a hearing on the order pursuant to section 22a-436 or an appeal pursuant to section 22a-437 is pending. . . ."

[4] General Statutes § 22a-458 provides: "Water pollution control authority, mandatory establishment by municipality. Notwithstanding any provision of the general statutes, any special act or municipal charter provision to the contrary, including but not limited to any referendum provision, the legislative body of any municipality ordered by the commissioner of environmental protection, under the provisions of chapter 474 and this chapter, to abate or control water pollution shall establish a water pollution control authority and authorize the necessary funds to undertake and complete any action necessary to comply with such order."

violated General Statutes § 22a-427,[5] by causing pollution of the waters of the state as a result of its failure to implement orders 3109, 3110, 3111 and modified order 4116. In counts five and seven, the complaint alleged that Old Saybrook had violated the Environmental Protection Act, General Statutes § 22a-14 et seq.,[6] by causing "unreasonable pollution, impairment or destruction of the water and other natural resources of the state" through its failure to implement orders 3109, 3110, 3111 and modified order 4116.

The trial court, *J. Walsh, J.*, first denied a motion to dismiss for lack of subject matter jurisdiction to decide each claim under §§ 22a-14 et seq., 22a-435 and 22a-438. After trial, the trial court, *Hon. Frances Allen*, state trial referee, concluded that Old Saybrook was bound by the terms of modified order 4116 either because Old Saybrook had agreed to the modified order or because it had failed to take a timely appeal therefrom. The trial court further determined that Old Saybrook had violated each of the four orders and, as alleged, had caused pollution in violation of §§ 22a-14 et seq., 22a-427, 22a-435 and 22a-438. Accordingly, the trial court rendered judgment in favor of the commissioner on all counts, imposing substantial civil penalties on Old

[5] General Statutes § 22a-427 provides: "Pollution or discharge of wastes prohibited. No person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provision of this chapter."

[6] General Statutes § 22a-16 provides in relevant part: "Action for declaratory and equitable relief against unreasonable pollution. The attorney general . . . [or] any instrumentality or agency of the state . . . may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business . . . for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ."

Saybrook and enjoining Old Saybrook to comply with the orders to abate pollution.

On appeal, Old Saybrook claims, inter alia, that the trial court improperly: (1) concluded that Old Saybrook had validly agreed to modified order 4116 or, in the alternative, that the order constituted a valid new order; (2) concluded that § 22a-427 creates a cause of action independent of the cause of action for violations of orders created by §§ 22a-435 and 22a-438; (3) determined that Old Saybrook has violated either §§ 22a-427 or 22a-14 et seq. by causing pollution in any respect; and (4) imposed civil penalties on Old Saybrook.[7] We agree with Old Saybrook that modified order 4116 is not binding on it. We conclude, however, that the trial court properly determined that Old Saybrook has violated orders 3109, 3110 and 3111, and that the civil penalties imposed by the trial court with respect to these orders are within its discretion. We also conclude that the record is not sufficiently specific about the basis upon which the trial court held that Old Saybrook

---

[7] In addition, Old Saybrook claims that § 22a-427 is void for vagueness. Because Old Saybrook did not clearly raise this issue before the trial court and the trial court did not address it, we decline to address it for the first time on appeal. See *Lewis* v. *Statewide Grievance Committee*, 235 Conn. 693, 704 n.10, 669 A.2d 1202 (1996); *Forsyth* v. *Rowe*, 226 Conn. 818, 830 n.14, 629 A.2d 379 (1993).

Finally, Old Saybrook claims that the trial court improperly declined to dismiss the claims under § 22a-14 et seq. because of improper venue. Although the record is obscure, it appears that the trial court determined it had subject matter jurisdiction despite the allegedly improper venue. We decline to reach this issue, however, because it was inadequately briefed. Old Saybrook's argument on this issue consists of one conclusory sentence stating that the venue provision in General Statutes § 22a-16 is mandatory and a citation to a case; *Farricielli* v. *Personnel Appeal Board*, 186 Conn. 198, 200–205, 440 A.2d 286 (1982) (holding that venue provision in Uniform Administrative Procedure Act is mandatory); that is not directly on point. On this record, we are not prepared to conclude that § 22a-16 deprives the trial court of jurisdiction to consider the claims brought to it by the commissioner. See *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 83 n.4, 612 A.2d 1130 (1992).

has violated applicable environmental statutes by "causing pollution," and therefore direct the trial court to provide an articulation of its holding in this respect.

## I

Old Saybrook's principal claims challenge the validity of modified order 4116, which purports to obligate Old Saybrook to construct a regional wastewater treatment facility. There are two issues with respect to modified order 4116: (1) did proper officials of Old Saybrook validly manifest its agreement with modified order 4116; and (2) is modified order 4116 enforceable against Old Saybrook without regard to whether Old Saybrook agreed, on the ground that it was a new order from which Old Saybrook did not take a timely appeal. We agree with Old Saybrook on both of these issues, and therefore hold that the commissioner cannot rely on modified order 4116 as a basis for requiring the construction of the treatment facility.

We are guided in our analysis by the standard of appellate review that governs questions of law. "We have long held that where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *Carothers* v. *Capozziello*, 215 Conn. 82, 132, 574 A.2d 1268 (1990).

## A

Old Saybrook's challenge to the validity of its purported agreement to modified order 4116 rests on its contention that any such agreement required compliance with the provisions of the General Statutes and the Old Saybrook town charter. Before we can address the merits of this argument, we must decide what rules govern a purported modification of an order issued

pursuant to the Water Pollution Control Act. General Statutes § 22a-416 et seq.

The Water Pollution Control Act sets forth a comprehensive statutory scheme for the protection of the waters of the state. After an administrative finding that a municipality "is causing" pollution, § 22a-428 authorizes the commissioner to order a municipality to abate such pollution. See footnote 3. After the issuance of a pollution abatement order[8] a municipality may request a hearing and, if further relief is sought, may appeal the order to the trial court. General Statutes §§ 22a-436 and 22a-437.[9] If no hearing is requested within thirty days,

---

[8] Generally, an original order is issued and the time for appeal begins to run once the commissioner sends the order by certified mail to the municipality. See General Statutes § 22a-436; footnote 9.

[9] General Statutes § 22a-436 provides in relevant part: "Hearing on order to abate. Each order to abate pollution issued under section 22a-428 . . . shall be sent by certified mail, return receipt requested, to the subject of such order . . . and shall be deemed issued upon deposit in the mail. Any person who or municipality which is aggrieved by any such order . . . may, within thirty days from the date such order . . . is sent, request a hearing before the commissioner. The commissioner shall not grant any request for a hearing at any time thereafter. After such hearing, the commissioner shall consider the facts presented to him by the person or municipality, including, but not limited to, technological feasibility, shall consider the rebuttal or other evidence presented to or by him, and shall then revise and resubmit the order to the person or municipality, or inform the person or municipality that the previous order has been affirmed and remains in effect. The request for a hearing as provided for in this section . . . shall be a condition precedent to the taking of an appeal by the person or municipality under the provisions of section 22a-437. The commissioner may, after the hearing provided for in this section, or at any time after the issuance of his order, modify such order by agreement or extend the time schedule therefor if he deems such modification or extension advisable or necessary, and any such modification or extension shall be deemed to be a revision of an existing order and shall not constitute a new order. There shall be no hearing subsequent to or any appeal from any such modification or extension."

General Statutes § 22a-437 provides in relevant part: "Appeal. (a) Any person who or municipality which is aggrieved by . . . any order of the commissioner other than an order under section 22a-6b, to abate pollution may, after a hearing by the commissioner as provided for in section 22a-436 . . . appeal from the final determination of the commissioner based on such hearing to the superior court as provided in chapter 54. . . ."

the pollution abatement order becomes final and thereafter no further hearing may be requested and no appeal may be taken. See General Statutes §§ 22a-436 and 22a-437.

Section 22a-436 provides that the commissioner may modify a pollution abatement order "by agreement" with the municipality.[10] The modified order created by agreement "shall not constitute a new order [and t]here shall be no hearing subsequent to or any appeal from such modification . . . ." General Statutes § 22a-436. The statute does not stipulate the manner in which a municipality must manifest its agreement to a modified order.

In the absence of an expressly applicable statutory mandate in § 22a-436, we conclude that the validity of a municipality's agreement to a modified pollution abatement order depends on compliance with the procedures specified in applicable provisions of the General Statutes and of the municipality's charter. A municipality is a creature of the state. "It is well established that a city's charter is the fountainhead of municipal powers. *State ex rel. Raslavsky* v. *Bonvouloir*, 167 Conn. 357, 362, 355 A.2d 275 (1974). The charter serves as an enabling act, both creating power and prescribing the form in which it must be exercised. *Food, Beverage & Express Drivers Local Union* v. *Shelton*, 147 Conn. 401, 405, 161 A.2d 587 (1960); *Thomson* v. *New Haven*, 100 Conn. 604, 606, 124 A. 247 (1924); *State ex rel. Southey* v. *Lashar*, 71 Conn. 540, 545–46, 42 A. 636 (1899)." *Perretta* v. *New Britain*, 185 Conn. 88, 92, 440 A.2d 823 (1981).

To determine the validity of Old Saybrook's purported agreement to the modified pollution abatement

---

[10] The commissioner may unilaterally modify an order by granting the municipality additional time to meet its requirements. General Statutes § 22a-436. The commissioner did not do so in this case.

order in this case, we must therefore examine not only the conduct of individual Old Saybrook officials, but also the relevant provisions of the General Statutes and the Old Saybrook town charter provisions that constrain their authority to act.[11] The trial court found that several of Old Saybrook's officials, including its board of selectmen, its first selectman, and its town attorney, were fully cognizant of the terms of the modified order, had discussed its merits and had voiced no objection thereto. The question before us is whether these officials and the board of selectmen had the power and properly exercised the power to agree to a modified order that would commit Old Saybrook to spend approximately $16 million toward the construction of a regional wastewater treatment facility and, thereby, waived Old Saybrook's right to contest the validity of the construction order in court. See General Statutes § 22a-436.

Old Saybrook contends that it did not agree to the order modification because no official, board or commission ever validly agreed to the order. Furthermore, Old Saybrook contends that if any official or body did indicate agreement, that official or body lacked the authority to do so. The commissioner disagrees, arguing that the board of selectmen, the first selectman and the town counsel indicated Old Saybrook's agreement to the modification by their conduct and statements, and that the first selectman, in particular, had the authority so to agree.

We conclude that, although the board of selectmen had authority under the relevant statutes and the town charter to agree to an order modification with such consequences, it failed to exercise that power properly.

---

[11] Because other towns may have different charters, we do not decide the proper method by which other towns would agree to such order modifications. See *Laurel Beach Assn.* v. *Milford,* 148 Conn. 233, 238, 169 A.2d 748 (1961).

Furthermore, we disagree with the trial court's determination that the relevant provisions of the General Statutes and the town charter conferred this authority on the first selectman and the town counsel. As a result, we conclude that Old Saybrook never validly agreed to the order modification.

The General Statutes grant Old Saybrook the power to agree to any environmental order and thereby to bind itself to the construction of a wastewater treatment facility. See General Statutes § 7-148 (c) (1) (A) (granting all towns power to "[c]ontract and be contracted with, [to] sue and be sued"); General Statutes § 7-148 (c) (6) (A) (ii) (granting all towns power to "[c]reate, provide for, construct, regulate and maintain all things in the nature of public works and improvements"); General Statutes § 7-148 (c) (6) (B) (i) (granting all towns power to "[l]ay out, construct, reconstruct, repair, maintain, operate, alter, extend and discontinue . . . sewage disposal plants"); General Statutes § 7-194 (granting all towns that have charters power to "provide for the execution of contracts").

The authority of towns to enter into binding agreements of this kind is an authority that is vested, both under the General Statutes and under the charter of Old Saybrook, in the board of selectmen and not in the first selectman or the town counsel. General Statutes § 7-12 specifically authorizes the board of selectmen to "superintend the concerns of the town, adjust and settle all claims against it and draw orders on the treasurer for their payment." The charter of Old Saybrook vests in the board of selectmen all powers and duties granted to boards of selectmen by the constitution and the General Statutes. Old Saybrook Charter, c. 3, § 4. Boards of selectmen, therefore, have the power to prosecute and defend suits to which the town is a party; *Union* v. *Crawford*, 19 Conn. 331, 337 (1848); to submit claims to arbitration; *Mallory* v. *Huntington*, 64

Conn. 88, 96, 29 A. 245 (1894); and to settle claims. General Statutes § 7-12.

The authority vested in boards of selectmen to settle claims includes the authority to agree to an order modification pursuant to § 22a-436. By relinquishing its right to appeal the modified order, the town gains an opportunity to bargain with the commissioner for more favorable terms in the modified order. Such bargaining is analogous to settling a lawsuit. Moreover, the settlement of such a claim falls within the authority of the board of selectmen even though its implementation requires substantial town expenditures. Although General Statutes § 7-348[12] limits the board of selectmen's

---

[12] General Statutes § 7-348 provides in relevant part: "Towns not to contract in excess of appropriations. Town meeting to increase amount. No officer of such town shall expend or enter into any contract by which the town shall become liable for any sum which, with any contract then in force, shall exceed the appropriation for the department, except in cases of necessity connected with the repair of highways, bridges, sidewalks and water and sewer systems and the care of the town poor, and then not more than one thousand dollars. If any occasion arises whereby more money is needed for any department of the town than has been appropriated as provided for in this chapter, the selectmen shall notify the board of finance of such fact, and the chairman of such board shall forthwith call a meeting thereof to consider the appropriation for such department and the board may make the necessary appropriation therefor, after inquiry, but, if, in towns where the grand list is not more than twenty million dollars, the amount required or the amount required, together with the sum of any additional appropriations made by the board for such department within the same fiscal year, exceeds ten thousand dollars, or, in towns where the grand list exceeds twenty million dollars, if the amount required or the amount required, together with the sum of any such additional appropriations, exceeds twenty thousand dollars, such appropriation shall not be made until, upon the recommendation of the board, the same has been voted by the town at a meeting called for such purpose, provided no more than one such additional appropriation for any one department shall be made in one year without town meeting approval, and provided the board may make additional appropriations for the care of town poor without town meeting approval not exceeding, in the aggregate, two thousand dollars in towns where the grand list does not exceed twenty million dollars or four thousand dollars in towns where the grand list exceeds twenty million dollars. . . . *The provisions of this chapter shall not be . . . a limitation*

authority to contract in excess of appropriations, this provision expressly is not "a limitation upon the settlement of claims or judgments against the town."

In order to exercise properly its authority to settle claims, however, the board of selectmen was required to take such action at a regular or special meeting.[13] Whenever the General Statutes or the municipal charter prescribes a particular procedure by which a specific act is to be done or a power is to be exercised, the prescribed procedure must be followed for the act to be lawful. *Caldrello* v. *Planning Board*, 193 Conn. 387, 391, 476 A.2d 1063 (1984); *Miller* v. *Eighth Utilities District*, 179 Conn. 589, 594, 427 A.2d 425 (1980); *Food, Beverage & Express Drivers Local Union* v. *Shelton*, supra, 147 Conn. 405; *Connelly* v. *Bridgeport*, 104 Conn. 238, 253, 132 A. 690 (1926). Because those "who contract with a municipal corporation are charged with notice of the extent of . . . the powers of municipal officers and agents with whom they contract . . . it follows that if the . . . agent had in fact no power to bind the municipality, there is no liability on the express contract . . . ." (Internal quotation marks omitted.) *Norwalk* v. *Board of Labor Relations*, 206 Conn. 449, 452, 538 A.2d 694 (1988).

"It is a well-settled rule that when municipal councils or boards of any kind are called upon to perform legislative acts or acts involving discretion and judgment in administering the public affairs, *they can only act at authorized meetings* duly held. The council or board

*upon the settlement of claims or judgments against the town under the provisions of law.*" (Emphasis added.)

[13] Although it is possible for a board of selectmen, which is competent to enter into a particular contract, to ratify the unauthorized actions of its agents by silence, the only silence that can constitute ratification is the failure of the board to object when the unauthorized actions are fully disclosed to the board at a meeting of that board. See *Blakeslee* v. *Water Commissioners*, 121 Conn. 163, 178–79, 183 A. 887 (1936). The commissioner did not allege and the trial court did not find that such a ratification had occurred.

must meet and act as a board or council. The members cannot make a valid determination binding upon the [municipality] by their assent separately and individually expressed." (Emphasis in original; internal quotation marks omitted.) *Jack* v. *Torrant*, 136 Conn. 414, 420, 71 A.2d 705 (1950); *Pepe* v. *New Britain*, 203 Conn. 281, 290, 524 A.2d 629 (1987); *Ziomek* v. *Bartimole*, 156 Conn. 604, 612, 244 A.2d 380 (1968); see also 10 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1990) § 29.15. This well settled rule is supported by the charter of Old Saybrook, which, although allowing the board of selectmen to determine its own rules of procedure, requires meetings to be open to the public, votes to be recorded, a quorum to be present and no "ordinance, resolution, or vote . . . [to] be adopted by less than two (2) affirmative votes." Old Saybrook Charter, c. 3, § 3. Indeed, the obligation to build a wastewater treatment facility "affects too many rights . . . and imposes upon the town too heavy a responsibility for maintenance and too great a liability" for failure to construct the facility "to permit it to be done by the board without formal action, duly recorded." *Stratford* v. *Fidelity & Casualty Co.*, 106 Conn. 34, 37, 137 A. 13 (1927) (involving construction of highway).

The trial court made no finding that the board of selectmen had approved the modification of order 4116 at a regular or special meeting, and our review of the record leads us to conclude that the board of selectmen did not so act. Although the board of selectmen formally adopted four resolutions relating to the proposed regional wastewater treatment facility, none of these resolutions constituted agreement by the board of selectmen to the modified order.

On June 1, 1989, the board of selectmen, acting in its capacity as the water pollution control authority, approved the acceptance of the Hayden-Wegman report that recommended the construction of the facility.

Whatever the reasons for this action may have been, we are persuaded that approving an engineering report does not constitute agreement to be bound by an order requiring costly implementation of the recommendations of that report.

On October 16, 1989, the board of selectmen, acting as the water pollution control authority, formally authorized the signing of an intermunicipal agreement with the towns of Clinton and Westbrook for the joint construction of the regional wastewater treatment facility. Although the signing of the intermunicipal agreement was a preliminary step necessary to appropriately obtaining financing from the state, allocating the cost among the towns and administering the construction of the facility, we are persuaded that agreement to the intermunicipal agreement does not constitute agreement to be bound by the modified order.

Finally, on October 19, 1989, the board of selectmen formally adopted two resolutions that authorized placement on a referendum by the town meeting of questions relating to the following issues: the appropriation of funds for designing the wastewater treatment facility and for acquiring the necessary land, and the execution of the intermunicipal agreement. These resolutions do not constitute agreement to the order modification because they do not manifest assent to be bound by the modified order in the absence of approval of the questions by referendum. Indeed, the questions were defeated at a referendum held on November 21, 1989. We conclude that none of these resolutions constitutes agreement to the modified order.

The trial court found that Old Saybrook's agreement to the modified order had been manifested not only by its board of selectmen but also by the first selectman

and the town counsel, singly and jointly.[14] The difficulty with premising town agreement on the actions of these town officials is that they lacked the authority to agree to this order modification.

The first selectman had no authority, either under the General Statutes or under the charter of Old Saybrook, to agree to modified order 4116. Both General Statutes § 7-12a and chapter 4, § 1, of the town charter designate the first selectman as the town's chief administrative officer. As chief administrative officer, the first selectman has the responsibility to preside over meetings of the board of selectmen and to act as the ceremonial head of the town; Old Saybrook Charter, c. 3, § 2; but has no express authority to settle claims or to contract.[15] Because the General Statutes and the charter of

[14] In particular, the trial court determined that the following actions of the first selectman and the town counsel manifested Old Saybrook's assent to the order modification: (1) the town counsel received a letter from the department regarding the proposed modification and did not respond or object at that time; (2) the town counsel and the first selectman attended various meetings with the department at which the proposed modification was discussed; (3) the first selectman requested hand delivery of a signed copy of the modified order; (4) the town counsel and the first selectman attempted to appropriate money for the wastewater treatment facility; and (5) the town counsel and first selectman acted to effect an intermunicipal agreement between Old Saybrook, Westbrook and Clinton for the purpose of building the regional wastewater treatment facility.

[15] The duties of the first selectman as provided in the charter of Old Saybrook, chapter 4, § 2, are as follows: "(a) The First Selectman shall administer and execute, or cause to be administered and executed, the Town ordinances, the regulations, resolutions or policies voted, enacted, or adopted by the Board of Selectmen and the Town Meeting.

"(b) The First Selectman shall be responsible for coordinating the administrative activities of the officers, boards, commissions, and other agencies of the Town with the exception of those functions delegated exclusively to such bodies by law.

"(c) The First Selectman shall be responsible for a continuing review of the current and future needs of the Town, including the financial needs and budget requirements. The First Selectman shall keep full and complete records of the doings of his office and shall be responsible for the keeping of complete books of the Town showing the financial condition and financial transactions of the Town, including accounts of all funds and appropriations

Old Saybrook expressly confer such authority on the board of selectmen, we conclude that the first selectman has no such implied authority.

Furthermore, we conclude that the board of selectmen did not delegate to the first selectman the authority to agree to the order modification. Having the authority to agree to the order modification, the board of selectmen theoretically could have delegated that authority to any selectman; see 3 E. McQuillin, supra, § 12.43 and vol. 10, § 29.15;[16] but it did not do so. On June 15, 1989, acting as the water pollution control authority, the board of selectmen expressly resolved that the first selectman had authority to apply for a grant and a loan from the state for the construction of the regional wastewater treatment facility.[17] Although the existence of a

and such other accounts and records not specifically required by law to be kept by other officers, all as may be prescribed by the Selectmen.

"(d) The First Selectman shall purchase or cause to be purchased, subject to such rules and regulations as shall be prescribed by the Selectmen, all supplies, materials, equipment and other commodities required by any office or agency of the Town except the Board of Education, and except for those offices, boards, commissions and agencies which, under the provisions of the Charter, ordinance, Special Act, or General Statutes of Connecticut, purchase such items in the performance of their own particular function."

[16] A board of selectmen, however, unless authorized by the charter or statute, may not have the power to "delegate its power to contract to . . . [an] officer where the exercise of discretion in making the contract is necessary." 10 E. McQuillin, supra, § 29.15.

[17] The resolution of the board of selectmen provided: "BE IT RESOLVED and hereby recorded in the minutes of this Board of Selectmen's meeting held on Thursday, June 15, 1989:

"THAT Barbara J. Maynard, First Selectwoman of the Town of Old Saybrook, acting on behalf of the Board of Selectmen and the Water Pollution Control Authority of the Town, is hereby authorized to make application for a Grant Account Loan from the State of Connecticut, through its Department of Environmental Protection, under the State's Clean Water Act. The funding sought is that as allowed under the Act, being 20% grant assistance, and 2% interest loan funding for the sewer project for the Town of Old Saybrook, as yet to be finally designated by the Water Pollution Control Authority of the Town. Said application is subject to necessary statutory approvals of the Town of Old Saybrook (including its legislative body), and approvals of the State of Connecticut.

"PASSED AND APPROVED this 15th day of June, 1989."

valid order is a prerequisite to an application for state funding, we conclude that delegation of the authority to apply for funding, as a matter of law, does not manifest delegation of the authority to agree to construct the wastewater treatment facility in accordance with the requirements of modified order 4116. No other alleged action by the board of selectmen supports the trial court's finding that the first selectman had been delegated the authority to act on behalf of the board of selectmen in this respect. Neither directly nor indirectly, therefore, did the first selectman have the authority to agree to modified order 4116.

The town counsel similarly had no authority to settle town claims. Unless granted additional powers by statute or charter, the town counsel may only "bind the municipality to the same extent that any attorney may bind his or her client." 10 E. McQuillin, supra, § 29.15. Because a town counsel generally "has no authority to compromise claims . . . an unauthorized compromise is not binding on the municipality." (Internal quotation marks omitted.) *Norwalk* v. *Board of Labor Relations*, supra, 206 Conn. 452; see also 3 E. McQuillin, supra, § 12.52.05. In the absence of a provision in the General Statutes or the charter of Old Saybrook[18] conferring on the town counsel the power to contract or to settle claims, the town counsel lacked the authority to agree to modified order 4116.

---

[18] The duties of the town counsel are specified in the charter of Old Saybrook, chapter 7, § 3, which provides as follows: The town counsel "shall appear for and protect the rights of the Town in all actions, suits, or proceedings brought by or against it or any of its officers, boards, commissions or agencies or members thereof in relation to their official duties. He shall be legal advisor to all Town officers, boards, commissions or agencies in all matters affecting the Town and shall upon written request furnish them with a written opinion on any question of law involving their respective powers and duties. Upon request he shall prepare or approve forms of contracts or other instruments to which the Town is a party or in which it has an interest."

For all the reasons stated above, we conclude that Old Saybrook never validly agreed to modified order 4116. To the extent that the trial court's injunctive orders and civil penalties depend upon its conclusion to the contrary, those injunctive orders and civil penalties are invalid.

### B

Even without Old Saybrook's agreement to modified order 4116, that order may be binding on the town on other grounds. The trial court determined that modified order 4116 was enforceable as a new order that was binding on Old Saybrook because Old Saybrook had not taken a timely appeal to challenge its validity. Old Saybrook claims, to the contrary, that modified order 4116 did not constitute a valid new order because Old Saybrook never received notice that the order, which was labeled "Order Modification," was an appealable new order. We agree with Old Saybrook.

The following facts are relevant to our resolution of this issue. At the request of the first selectman of Old Saybrook, an official of the department hand-delivered modified order 4116 to her. Modified order 4116 was labeled an "Order Modification," unlike the original order 4116 that was labeled "Order." Furthermore, the modified order stated in text that it had been "[e]ntered as a modification of" the original order 4116. The town did not appeal this order.

Because a town may appeal from a new order, but may not appeal from a modified one; General Statutes § 22a-436; whether modified order 4116 is properly characterized as a valid new order depends upon whether it appropriately informed Old Saybrook that the town could appeal. "The right of appeal, if it is to have any value, must necessarily contemplate that the person who is to exercise the right be given the opportunity of knowing that there is a decision to appeal from and

of forming an opinion as to whether that decision presents an appealable issue." (Internal quotation marks omitted.) *Bridgeport Bowl-O-Rama, Inc.* v. *Zoning Board of Appeals*, 195 Conn. 276, 281, 487 A.2d 559 (1985); *Hubbard* v. *Planning Commission*, 151 Conn. 269, 271–72, 196 A.2d 760 (1963). Any uncured defect in the notice may not be misleading. See *Cocivi* v. *Plan & Zoning Commission*, 20 Conn. App. 705, 708, 570 A.2d 226, cert. denied, 214 Conn. 808, 573 A.2d 319 (1990) (defective notice not cured by later publication because statute required notice to be published twice); see also *Cavallaro* v. *Durham*, 190 Conn. 746, 748, 462 A.2d 1042 (1983) (defective notice cured); *Selk* v. *District of Columbia Dept. of Employment Services*, 497 A.2d 1056, 1058 (D.C. App. 1985) (ambiguous notice of final determination held to be inadequate as matter of law because notice failed to specify whether appeal had to be filed within ten business days or within ten calendar days); *Matter of Edmead* v. *McGuire*, 67 N.Y.2d 714, 716, 490 N.E.2d 853, 499 N.Y.S.2d 934 (1986) (time for appeal does not run if agency through ambiguity creates impression that determination was not conclusive).

In the present case, the commissioner specifically labeled modified order 4116 as an order modification. Under the circumstances of this case, the use of that label, at a minimum, created an ambiguity about whether the order was an appealable new order or an unappealable modified order. Due to the ambiguity, the document failed to give Old Saybrook notice that an appealable order had been issued. We hold that if an agency has created ambiguity as to the nature of an order that leads a party reasonably to believe that he or she cannot appeal that order, that ambiguity must be resolved against the agency. The "order modification," therefore, must be construed only as an attempt to modify the original order 4116. Because we have already

held that Old Saybrook never validly agreed to the order modification, modified order 4116 is invalid.

## II

Old Saybrook also claims that the trial court improperly determined that § 22a-427[19] creates a cause of action on the part of the commissioner independent of the cause of action for violations of orders created by §§ 22a-435 and 22a-438.[20] The commissioner disagrees, claiming that he has the authority pursuant to General Statutes § 22a-6 (a) (3)[21] to sue for an injunction to enforce § 22a-427. We agree with the commissioner.

In interpreting statutes, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *HUD/Barbour-Waverly* v. *Wilson*, 235 Conn. 650, 656, 668 A.2d 1309 (1995). "Environmental statutes, considered remedial in nature, are to be construed liberally to reach the desired result. *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 57, 441 A.2d 68 (1981)." *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 382, 627 A.2d 1296 (1993).

[19] See footnote 5.

[20] See footnote 3.

[21] General Statutes § 22a-6 provides in relevant part: "Commissioner to establish environmental standards, regulations and fees, to make contracts and studies and to issue permits. Complaints. Hearings. Bonds. Notice of contested cases. (a) . . . (3) . . . The commissioner shall have the power to hold hearings, administer oaths, take testimony and subpoena witnesses and evidence, enter orders and institute legal proceedings including, but not limited to, suits for injunctions, for the enforcement of any statute, regulation, order or permit administered, adopted or issued by him . . . ."

We look first to the text of the relevant statutes. Section 22a-427 provides in relevant part that "[n]o person or municipality shall cause pollution of any of the waters of the state . . . ." This statute is silent as to whether the commissioner may sue directly under its provisions. Old Saybrook correctly asserts that § 22a-427 is part of a comprehensive statutory scheme, the Water Pollution Control Act, that allows the commissioner to issue an order to abate pollution; see General Statutes § 22a-428; and to sue for an injunction and for civil penalties for a violation of such an order. See General Statutes §§ 22a-435 and 22a-438. Nowhere in this comprehensive statutory scheme, however, is the commissioner explicitly prevented from suing to enjoin violations of § 22a-427.

The Water Pollution Control Act does not exist in a statutory vacuum. "Title 22a of the General Statutes is entitled 'Environmental Protection.' It contains various acts, all relating to the general purpose of the entire title. Sections 22a-1 through 22a-13 provide for the general state policy, create a department of environmental protection, and establish the duties and powers of the commissioner." *Connecticut Water Co.* v. *Beausoleil*, 204 Conn. 38, 44, 526 A.2d 1329 (1987). One of the powers of the commissioner, enumerated in § 22a-6 (a) (3), is the power to "institute legal proceedings including, but not limited to, suits for injunctions, for the enforcement of any statute . . . administered . . . by him . . . ." This unambiguous expression of legislative intent persuades us that the commissioner may sue for an injunction to abate pollution in violation of § 22a-427 whether or not the commissioner has chosen to issue an order to abate pollution.

III

Old Saybrook further claims that the trial court improperly determined that it has violated §§ 22a-427

and 22a-14 et seq. by failing to comply with the commissioner's orders because it is not affirmatively causing pollution. On the one hand, this issue relates to orders 3109, 3110 and 3111, which stand in one class, and we conclude that Old Saybrook may not prevail as to these orders. On the other hand, this issue relates to the substantive directive to build a regional wastewater treatment facility contained in modified order 4116, which, we determine, cannot be directly enforced yet may give rise to liability under §§ 22a-427 and 22a-14 et seq. We conclude, however, that the record is not sufficiently specific about the factual basis upon which the trial court held that Old Saybrook has violated these environmental statutes by causing pollution, and therefore direct the trial court to provide an articulation of its holding in this respect.

We first address orders 3109, 3110 and 3111. Old Saybrook's eleventh hour claim that it has not violated §§ 22a-427 and 22a-14 et seq. by causing pollution is unavailing because, having chosen not to appeal from these orders, Old Saybrook may not attack them in this proceeding. The commissioner issued orders 3109, 3110 and 3111 after finding that Old Saybrook was "maintaining conditions which can reasonably be anticipated to cause pollution of the waters of the state . . . ." Old Saybrook did not appeal from the issuance of these orders, and the time to appeal has passed. The trial court properly determined that the orders had been violated. Under these circumstances, the trial court must issue the requested injunction. See *Water Resources Commission* v. *Connecticut Sand & Stone Corp.*, 170 Conn. 27, 32–33, 364 A.2d 208 (1975); see also *Connecticut Water Co.* v. *Beausoleil*, supra, 204 Conn. 45. Old Saybrook cannot collaterally attack these orders in this proceeding.

We must next consider whether the trial court properly determined that Old Saybrook has caused pollution

in violation of §§ 22a-427 and 22a-14 et seq. by not building any wastewater treatment facility[22] to abate the pollution, in conjunction with its failure to comply with the prior orders. Old Saybrook contends that it has not "cause[d] pollution" within the meaning of § 22a-427 and has not engaged in "conduct . . . [that] has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the . . . water . . . of the state" within the meaning of § 22a-17. In particular, Old Saybrook contends that it has not actively discharged pollution and that its failure to abate pollution caused by its residents does not constitute a violation of these statutes. We conclude that a municipality may violate these statutes, which incorporate common law nuisance principles, without affirmatively causing pollution if the municipality has intentionally failed to abate a public nuisance. Old Saybrook, therefore, may have violated these statutes by intentionally failing to build a wastewater treatment facility. The trial court found a statutory violation, but did not specify whether it had found that Old Saybrook had acted negligently or intentionally in creating the public nuisance. We, therefore, must remand this case to the trial court for further articulation of this issue.

In determining whether a municipality's knowing failure to abate pollution amounts to causing pollution under §§ 22a-427 or 22a-14 et seq., our analysis "is guided by well established principles of statutory construction. Statutory construction is a question of law

---

[22] Under other circumstances, the water pollution caused by individual septic systems could perhaps be remedied by repairing and maintaining those systems. Both the Pirnie report and the Hadyen-Wegman report, however, indicated that Old Saybrook could not remedy its pollution problem simply by repairing and maintaining the individual septic systems because of the high groundwater table and the small size of many residential lots. Indeed, the Hayden-Wegman report specifically concluded that a regional wastewater treatment facility would be the best solution. Old Saybrook has never questioned the scientific validity of these studies.

and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Burns,* supra, 236 Conn. 22–23; *HUD/Barbour-Waverly* v. *Wilson,* supra, 235 Conn. 656.

Our analysis begins with the language of the statutory provisions at issue. Neither of these statutory schemes, however, indicates whether a municipality must itself affirmatively pollute the waters of the state in order to violate the scheme. Section 22a-427 provides in relevant part that "[n]o person or municipality shall cause pollution of any of the waters of the state . . . ." Section 22a-16 is an expansive citizen suit provision allowing any person to sue anyone "for declaratory and equitable relief" in order to protect "the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." In order to establish a prima facie case under § 22a-16, the plaintiff must establish that "the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute . . . the public trust in the . . . water" of the state. General Statutes § 22a-17; see *Manchester Environmental Coalition* v. *Stockton,* supra, 184 Conn. 57–58. The legislative history of these statutes likewise is silent regarding whether a municipality may cause pollution without itself affirmatively discharging pollutants into the waters of the state.[23]

---

[23] The legislative comments regarding § 22a-427 stress the importance of preventing and ending the pollution of the waters of Connecticut. See, e.g.,

In the absence of guidance from the language of the statute or the legislative history, we look to common law principles of nuisance. "It is assumed that all legislation is interpreted in light of the common law at the time of its enactment. 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1984 Rev.) § 50.01." *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 389. This presumption is particularly apt in relation to environmental statutes. See id., 389 and n.24. Indeed, the Water Pollution Control Act expressly incorporates common law public nuisance principles by declaring that "the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, [and is] a public nuisance. . . ." General Statutes § 22a-422; see *Starr* v. *Commissioner of Environmental Protection*, supra, 382.

In light of the statutory declaration that water pollution constitutes a public nuisance; General Statutes § 22a-422; Old Saybrook apparently does not contest that the pollution of the Connecticut River and the Long Island Sound by the failing septic systems in Old Saybrook is a public nuisance. A public nuisance exists if: (1) the condition complained of has a natural tendency to create danger and inflict injury upon person or property; (2) the danger created is a continuing one; (3) the use of the land is unreasonable or unlawful; and

---

12 S. Proc., Pt. 2, 1967 Sess., pp. 667–68, remarks of Senator William B. Stanley. Indeed, legislators seemed particularly concerned with strengthening the commissioner's enforcement powers in order to prevent further pollution from inadequately treated municipal sewage. See, e.g., 12 H.R. Proc., Pt. 3, 1967 Sess., p. 912, remarks of Representative Peter A. Crombie; id., pp. 917–18, remarks of Representative Carl R. Ajello; id., p. 933, remarks of Representative Paul Pawlak, Sr.

The legislative comments regarding § 22a-14 et seq. stress the expansion of a citizen's ability to pursue polluters who unreasonably pollute the environment; see, e.g., 14 H.R. Proc., Pt. 2, 1971 Sess., pp. 736–37, remarks of Representative Francis W. Ciampi; and to avoid delays associated with waiting for the appropriate agency to act. See, e.g., id., pp. 746–47, remarks of Representative Howard A. Newman.

(4) the condition or conduct complained of interferes with a right common to the general public. *State* v. *Tippets-Abbett-McCarthy-Stratton*, 204 Conn. 177, 183, 527 A.2d 688 (1987); see also *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 394.

A public nuisance can be created intentionally or negligently. A nuisance is created intentionally if "the creator of the condition intends the act that brings about the condition . . . ." *Quinnett* v. *Newman*, 213 Conn. 343, 348, 568 A.2d 786 (1990). We hold today that "an interference with the public right, is intentional if the [municipality] . . . knows that it is resulting or is substantially certain to result from [its] conduct." 4 Restatement (Second), Torts § 825 (1979); see, e.g., *Sandifer Motors, Inc.* v. *Roeland Park*, 6 Kan. App. 2d 308, 317–19, 628 P.2d 239, review denied, 230 Kan. 819 (1981); *Sanford* v. *Detroit*, 143 Mich. App. 194, 199, 371 N.W.2d 904 (1985); *Fletcher* v. *Independence*, 708 S.W.2d 158, 169 n.2 (Mo. App. 1986); *Princeton* v. *Abbott*, 792 S.W.2d 161, 166 (Tex. App. 1990).[24] "It is the knowledge that the actor has at the time [the actor] acts or fails to act that determines whether the invasion resulting from [its] conduct is intentional or unintentional. It is not enough to make an invasion intentional that the actor realizes or should realize that [its] conduct

---

[24] Many states have adopted § 825 of the Restatement (Second), supra, although not specifically in the context of municipal liability. See, e.g., *Nelson* v. *C & C Plywood Corp.*, 154 Mont. 414, 429, 465 P.2d 314 (1970); *Hall* v. *Phillips*, 231 Neb. 269, 277–78, 436 N.W.2d 139 (1989); *Copart Industries, Inc.* v. *Consolidated Edison Co.*, 41 N.Y.2d 564, 571, 362 N.E.2d 968, 394 N.Y.S.2d 169, reconsideration denied, 42 N.Y.2d 1102 (1977); *Phillips Ranch, Inc.* v. *Banta*, 273 Or. 784, 791 and n.5, 543 P.2d 1035 (1975); *Kohr* v. *Weber*, 402 Pa. 63, 70, 166 A.2d 871 (1960); *Morgan* v. *Quailbrook Condominium Co.*, 704 P.2d 573, 576–77 (Utah 1985).

Arkansas and New Mexico have specifically applied § 825 to impose liability on a municipality for an intentional nuisance that had ripened into inverse condemnation. See *Robinson* v. *Ashdown*, 301 Ark. 226, 230–32, 783 S.W.2d 53 (1990); *Electro-Jet Tool & Mfg. Co.* v. *Albuquerque*, 114 N.M. 676, 845 P.2d 770, 777 (1992).

involves a serious risk or likelihood of causing the invasion. [The actor] must either act for the purpose of causing it or *know that it is resulting or is substantially certain to result from [the actor's] conduct.*" (Emphasis added.) 4 Restatement (Second), supra, § 825, comment c. If the invasion results from continuing or recurrent conduct, "the first invasion resulting from the actor's conduct may be either intentional or unintentional; but [*if*] *the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.*" (Emphasis added.) Id., § 825, comment d.

Because Old Saybrook is a municipality, it would not be liable for maintaining a public nuisance through its failure to abate pollution under the common law if its conduct were merely negligent nonfeasance. We have long held that "[l]iability can be imposed on the municipality only in the event that, if the condition constitute[s] a nuisance, it was created by some positive act of the municipality." *Brennan* v. *West Haven*, 151 Conn. 689, 692, 202 A.2d 134 (1964); *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 388; *Lukas* v. *New Haven*, 184 Conn. 205, 209, 439 A.2d 949 (1981); *Wright* v. *Brown*, 167 Conn. 464, 470, 356 A.2d 176 (1975). Indeed, we have stated that "failure to remedy a condition not of the municipality's own making is not the equivalent of the required positive act in imposing liability in nuisance upon a municipality." *Lukas* v. *New Haven*, supra, 209–10; *Brennan* v. *West Haven*, supra, 693; see *Sheeler* v. *Waterbury*, 138 Conn. 111, 115, 82 A.2d 359 (1951).

The rule limiting municipal liability for nuisance created through mere nonfeasance has its origins in principles of municipal immunity. Noting that municipalities are not liable, under the common law, for mere "negligence in the performance of governmental functions and duties," we concluded, in *Hoffman* v. *Bristol*, 113

Conn. 386, 389, 155 A. 499 (1931), that a municipality may be liable for a nuisance it creates through its negligent misfeasance or nonfeasance even if that misfeasance or nonfeasance also constitutes negligence from which the municipality would be immune. Id., 389. We then listed examples from our prior cases in order to illustrate the distinction between nuisance and mere negligence. Id., 391–92. Without further analysis, later cases, citing *Hoffman*, have stated the rule more broadly to preclude liability for any nuisance created through mere nonfeasance. See, e.g., *Sheeler* v. *Waterbury*, supra, 138 Conn. 115–16; *Bacon* v. *Rocky Hill*, 126 Conn. 402, 407, 11 A.2d 399 (1940).

These precedents arose in the context of claims of municipal liability for nuisance created *negligently* through the unintentional conduct of the municipality. The language of the opinions is, however, broader than the claims therein resolved. The language speaks expansively of municipal immunity in the absence of some positive act of the municipality. Despite this sweeping language, we have never held that a municipality is not liable for an *intentional* nuisance created through its failure to abate pollution.[25]

The question before us, therefore, is whether to extend the rationale of these precedents to provide

[25] In applying the rule to preclude municipal liability for a nuisance not created by the municipality's positive act, we have never been faced with allegations and findings that support intentional public nuisance. See, e.g., *Lukas* v. *New Haven*, supra, 184 Conn. 209–10 (municipality failed to plow sufficiently snow and ice from street; nuisance not created by municipality, but "essentially natural in origin"); *Pluhowsky* v. *New Haven*, 151 Conn. 337, 345–46, 197 A.2d 645 (1964) (municipality would be liable for constructing inadequate or defective storm water sewer system but not for negligently failing to unclog debris swept in by flooding); *Sheeler* v. *Waterbury*, supra, 138 Conn. 115–16 (mere presence of snow and ice on sidewalk through negligence insufficient to establish municipal liability); *Karnasiewicz* v. *New Britain*, 131 Conn. 691, 695, 42 A.2d 32 (1945) (municipality did not effect grade of street that constituted nuisance); *Stoto* v. *Waterbury*, 119 Conn. 14, 18–19, 174 A. 189 (1934) (municipality may be liable when it,

immunity to a municipality for its intentional creation of a public nuisance. Without deciding what the law of municipal liability may be in other contexts, in light of the strong public policy manifested by the environmental protection statutes,[26] we conclude that a municipality may be liable for a public nuisance that it intentionally creates through its prolonged and deliberate failure to act to abate that nuisance.

The trial court found that Old Saybrook has caused pollution "by not abating the pollution which it can best abate." The trial court grounded this finding in Old Saybrook's failure to implement the sewer avoidance program set forth in orders 3109, 3110 and 3111. Specifically, despite its acquiescence in the validity of these orders, Old Saybrook has failed to implement the appropriate programs to inspect area septic systems, monitor contamination of area groundwater and surface waters, regulate the pumping of septic systems through a permit system, effect maintenance of septic systems by residential property owners through an enforcement system, and has failed to report its compliance with these orders to the commissioner. Furthermore, Old Saybrook has failed to build a regional wastewater treatment facility without challenging the adequacy of the financial contributions to be made by neighboring towns or the scientific validity of the engineering study that had found that failing septic systems were polluting

---

apparently wrongfully, caused gated areaway to be constructed, and its agents negligently created nuisance by leaving area open and unguarded).

[26] In other areas of the law, we have recognized the need to adapt the common law to reflect policy changes in our statutory law. See, e.g., *Bohan* v. *Last*, 236 Conn. 670, 680, 674 A.2d 839 (1996) (common law liability of purveyors of alcohol to minors reflecting policy of criminal liability for such purveyance); *Fahy* v. *Fahy*, 227 Conn. 505, 513–16, 630 A.2d 1328 (1993) (common law rules for alimony orders reflecting policy of statutory rules for support orders); *Hamm* v. *Taylor*, 180 Conn. 491, 494–96, 429 A.2d 946 (1980) (common law principles of unconscionability in real estate transactions reflecting statutory principles of unconscionability in commercial transactions).

the Connecticut River in a manner that could be remedied best by the construction of such a regional wastewater treatment facility.

We conclude nonetheless that the trial court's finding that Old Saybrook has caused pollution is not sufficiently specific with respect to whether Old Saybrook's continuing conduct over time in creating a public nuisance, in light of the various orders, rose to the level of intentional conduct under § 825 of the Restatement (Second) of Torts. "An articulation is appropriate [if] the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification." (Internal quotation marks omitted.) *Carothers* v. *Capozziello,* supra, 215 Conn. 114; see Practice Book § 4061; *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* 210 Conn. 734, 751, 557 A.2d 525, on appeal after remand, 212 Conn. 322, 561 A.2d 436 (1989); *Gould* v. *Sturman,* 186 Conn. 13, 16, 438 A.2d 1181 (1982). Accordingly, we remand this case for further articulation of this issue, and retain jurisdiction for the purpose of appeal.

## IV

Last, we address whether the trial court properly issued civil penalties against Old Saybrook for failing to comply with orders 3109, 3110 and 3111 and modified order 4116. Old Saybrook contends that the trial court abused its discretion in imposing these penalties. Because we have determined that modified order 4116 was never properly agreed to or issued, any penalty imposed against Old Saybrook for noncompliance with that order is invalid. That invalidity does not, however, impair the propriety of the trial court's exercise of discretion to impose civil penalties based on violations of the other orders. We must address whether the trial court appropriately exercised its discretion in imposing a civil penalty of $22,660 against Old Saybrook for vio-

lating each of the remaining orders, orders 3109, 3110 and 3111.[27] We conclude that the trial court did not abuse its discretion in imposing these penalties.

Section 22a-438 permits the trial court to impose a civil penalty not to exceed $25,000 for each day of each violation of an order. In imposing a civil penalty, the court may consider "the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors as deemed appropriate by the court. The court shall consider the status of the person or municipality as a persistent violator." General Statutes § 22a-438 (a); see also *Keeney* v. *L & S Construction*, 226 Conn. 205, 214–15, 626 A.2d 1299 (1993). The trial court stated that it had considered these factors, especially some good faith efforts of Old Saybrook to comply with the orders, the deterrent purpose of the penalties and the financial consequences of such penalties on the town.

Although the trial court might well have discussed each statutory factor in further detail, it indicated that it had considered the appropriate factors, and "[t]he defendants have not sought further articulation of the factual basis underlying the court's imposition of . . . civil penalties in [this case]. See Practice Book § 4051. . . . [On this record,] 'it would be sheer speculation for this court to assume that the trial court [incorrectly applied the] legal standard.' *State* v. *Crumpton*, 202 Conn. 224, 232, 520 A.2d 226 (1987); *DiBerardino* v. *DiBerardino*, [213 Conn. 373, 385, 568 A.2d 431 (1990)]." (Citations omitted; internal quotation marks omitted.) *Carothers* v. *Capozziello*, supra, 215 Conn. 105.

---

[27] The trial court penalized Old Saybrook in the amount of $20 per day for each day that each order was violated, beginning from the date the commissioner filed the complaint in this case, June 11, 1991, until August 3, 1994, a period of 1133 days.

We conclude that the trial court did not abuse its discretion in imposing a nominal civil penalty of $20 per day for violations of each valid order. "[T]here was ample evidence before the trial court to justify the imposition of . . . substantial penalties . . . ." Id. The trial court found that a pollution problem existed, that Old Saybrook had been aware of the pollution problem and that the town had made some good faith efforts to solve the problem. Old Saybrook, however, has failed to comply with orders 3109, 3110 and 3111 since 1983. Finally, the trial court considered the town's ability to pay and the need for deterrence. We conclude that the trial court did not abuse its discretion in imposing civil penalties in the amount of $67,980.

The judgment is reversed in part and the case is remanded with direction to render judgment for the defendant as to modified order 4116 and for further articulation in accordance with part III of this opinion.

In this opinion the other justices concurred.