JENNIFER ESPOSITO ET AL. *v.* NEW BRITAIN BASEBALL CLUB, INC., ET AL.

Superior Court, Judicial District of New Britain
File No. CV-03-0522820S

Memorandum filed April 28, 2005

*Clifford Chance U.S., LLP*, for the plaintiffs.

*Levy & Droney*, for the named defendant.

*Corporation counsel of the city of New Britain* and *Levy & Droney*, for the defendant city of New Britain.

*Mulvey, Oliver, Gould & Crotta*, for the defendant Telstar Display Fireworks, Inc.

BERGER, J. The plaintiffs, Jennifer Esposito, Eileen Collins, Seweryn Czwal, Jim Joseph, Sharon Joseph, Alan Pitts, Donna Pitts, Henry Rodrigue and Sharon Rodrigue-Baretta, Maija Santaniello, Billy Strickland and Katherine Strickland, Audrey Vaskalis and Joseph Volak,[1] live in a New Britain neighborhood that surrounds Willow Brook Park, a municipal recreation facility. The park is home to the high school football stadium and two baseball stadiums, Beehive (old stadium), now used by the high school and other recreational leagues and Veteran's (new stadium), now leased to the defendant New Britain Baseball Club, Inc., which owns and manages the New Britain Rock Cats (Rock Cats), a professional minor league team affiliated with the Minnesota Twins. The dispute, however, does not concern baseball. Rather, it is over the approximately twelve Friday evening fireworks shows hosted by the Rock Cats and which run from the early spring to the end of August. The city of New Britain as owner and lessor of the new stadium[2] and grantor of the fireworks permit, and Telstar Display Fireworks, Inc. (Telstar), a New Hampshire based corporation, as the supplier and operator of the fireworks shows, are also named as defendants.

The plaintiffs seek both damages and a permanent injunction prohibiting the defendants from commencing and continuing the almost biweekly fireworks shows. This dispute concerns our state's law of private nuisance and, specifically, the manner in which someone may use their property when that use affects another's property.

---

[1] Initially, forty-six residents were party to this action, but thirty-two withdrew prior to trial, leaving the present fourteen plaintiffs.

[2] The town of Berlin, although not a party to this action, owns part of the new stadium.

# I

## FACTS

Fireworks shows are held at the conclusion of each Friday night Rock Cats home game throughout their seventy-one game season. Generally, they start before 10 p.m., last approximately twenty minutes and are coordinated with music chosen by the owner of the Rock Cats. The previous team, the New Britain Red Sox, had for some time held only a Fourth of July fireworks show but, in about 1996, started presenting a few more fireworks shows each year, building up to the ten that were scheduled prior to the Rock Cats' lease of the new stadium. The number and schedule of shows, including those for the 2005 season, are reviewed and approved each year by the city's parks and recreation board. Twelve shows were scheduled for 2005, commencing on April 15, 2005.

### A

The plaintiffs,[3] mostly married couples or families with children, live to the north (Mill Street and Logan Street) and to the east (South Main Street) of Willow Brook Park, where the stadiums are located. Most have owned their homes for years—long before the Rock Cats existed. South Main Street is mostly commercial, and the Schaller automobile dealership is just south of the South Main Street plaintiffs' homes.[4] Those plaintiffs are able to hear the dealership's outdoor paging system. A small construction operation backs up to those properties and emits occasional machine noise. On approximately eight fall Friday evenings, they also hear the sounds of the public address system at the New Britain High School football games, including the sound of a

---

[3] Some plaintiffs testified in court; others, due to the repetitive nature of their stories, presented their testimony through a stipulation of counsel.

[4] The court, accompanied by counsel for all parties, visited the Mill Street and South Main Street neighborhood on March 17, 2005.

cannon firing when the team scores a touchdown. The high school is located on Mill Street, and those plaintiffs get to experience the occasional short but loud bursts of music as cars travel on the street. These neighborhood disturbances are not the subject of the plaintiffs' complaint, however. They have joined together in an attempt to end a disturbance that constitutes a real disruption to their lives on Friday nights throughout the spring and summer of each year.

Most of the plaintiffs testified that their normal routine changes on fireworks Fridays. They must close their windows and turn off their air conditioners to keep out noise, smoke and smell. The noise, which some compared to being at a firing range, makes it difficult to carry on conversations. One plaintiff testified that he goes into his basement to escape the noise; others leave their homes altogether. Another plaintiff, who works between 2 a.m. and 7:30 a.m., misses her usual night's sleep, between 8 p.m. and 1 a.m., on fireworks nights. Although the defendants testified that they have reduced the noise level over the past few years, the plaintiffs experience the noise as being as loud or even louder than ever. Some nights the smoke sits like a heavy cloud over their houses, seeping in through available openings, and sometimes lingering for hours. At times the smoke is so thick that the plaintiffs' ability to see beyond their property is limited. The smoke makes at least one plaintiff's eyes tear and on occasion she feels nauseated. The smell, which they described as sulfurous and awful, also invades their homes.

The reverberations from the fireworks make some plaintiffs feel that their homes are trembling. They experience the booms as earth shattering and like claps of

thunder.[5] Several plaintiffs have emotional reactions to the fireworks, feeling anxious, angry and frustrated. They also reported negative reactions from their family pets. One plaintiff spends fireworks evenings soothing her young daughter, born in July, 2000, who awakens frightened and crying from the explosions.

Other plaintiffs spend their evenings worried about the safety of their homes and other property. Two plaintiffs described staying outside during the shows to watch for falling embers. More than once, burning embers have landed on their property, requiring them to stamp them out. On one occasion, a plaintiff called the fire department because of burning debris from the fireworks. At least one plaintiff inspects his property for damage each morning after a show. The plaintiffs routinely find small pieces of fireworks debris on their houses and cars and in their yards. Many plaintiffs are further inconvenienced by the closing of their street, which limits their freedom to come and go from their property.

The plaintiffs uniformly expressed their frustration that they cannot relax and enjoy being in their homes because of this disturbance during the spring and summer. They are angry that they have been forced to tolerate these conditions and frustrated by the lack of concern shown by the city.[6] The plaintiffs have complained both to city officials and the Rock Cats. They have signed petitions, attended meetings and been involved in a task force with the city and the Rock Cats

[5] On April 15, 2005, this court, together with counsel, viewed and listened to the fireworks display at both a Mill Street and South Main Street location. It was a terrific fireworks display; it was also loud, and indeed, several of the explosions sounded like claps of thunder.

[6] It is appropriate to note that although the city was a defendant in the present action and had a member of its corporation counsel at counsel table during trial, the counsel for the Rock Cats served as primary counsel for the city at trial. For most of the plaintiffs' case, no representatives of the Rock Cats or the city other than counsel were in the courtroom.

designed to solve the problem. Many expressed a sense of hopelessness that city officials will ever take action to help them. As one plaintiff expressed it, you "can't fight city hall." Another noted that the task force has not met during the present administration and that she has given up complaining because Mayor Timothy Stewart, the former fire marshal, knew about the problem.[7]

### B

The Rock Cats maintain that the fireworks shows are not only essential for their financial existence and, indeed, appreciated by their fans, but that they are not all that loud. They presented Bennett Brooks, an experienced acoustical engineer (although testing fireworks for the first time), who testified about his two field tests, conducted in September, 2003, and 2004, across from the Joseph property on South Main Street.[8] The September, 2003 test took place on an evening when the wind was fairly calm, and he compared the noise of the loudest fireworks to a loud hand clap at a distance of three feet. The 2004 test was similar in nature to the 2003 test except that it was slightly shorter, running only seventeen minutes. Brooks noted that his digital readouts only recorded the highest level in ten second intervals, so that only the highest, rather than each sound impulse, was recorded. The graph thus contained 102 recordings or six per minute over the seventeen minute show. He noted that the ear can discern each impulse if sufficient time lapses; otherwise, the sound is blended.

Brooks explained that decibel levels cause pain to the human ear at about the 140 decibel level and

---

[7] Stewart stated that he was a former fire inspector and, in that capacity on specific overtime duty, supervised approximately fifteen shows from 1999 to 2003. He is now on a leave of absence from that position.

[8] The Josephs and their abutting neighbors, the Stricklands, live approximately 500 feet from the fireworks launching site.

explained that an increase of ten decibels, while a tenfold increase in energy, is perceived as twice as loud, an increase of twenty is perceived as four times and an increase of thirty decibels is perceived as eight times as loud. He noted that the decibel level decreases by approximately thirty decibels when sound travels through a typical house. He discussed his testing at a firing range, noting that at two ranges, decibel levels were from fifty to 110 decibels at 1000 feet. The highest level recorded at the fireworks show in 2004 was just over 110 decibels with approximately thirty-eight to forty impulses recorded over 100 decibels.[9] He opined that at 110 decibels, sound waves could not cause any property damage to a home.

William Dowling,[10] the president, general manager, and part owner of the Rock Cats, testified that he purchased the AA level farm team with his partners in 2000 and, as the Red Sox had moved to Springfield, Massachusetts, he affiliated with the Minnesota Twins. He discussed the business arrangement for minor league teams, including both the benefits provided by the major league sponsor as well as the obligations of the owner. He stressed that he is in the entertainment business; indeed, he stated that "it isn't about baseball, it's more about family entertainment." Dowling indi-

[9] Section 16-101 et seq. of the New Britain city code regulates noise and contains a general noise prohibition of levels greater than seventy decibels. City Code of New Britain § 16-105. It exempts various categories, however, including the subject use, "[n]oise created by any recreational activities which are permitted by law and for which a license or permit has been granted by the city, including but not limited to parades, sporting events, concerts and fireworks displays." Id., § 16-106 (b) (5).

Section 22a-69-3.5 of the Regulations of Connecticut State Agencies prohibits similar decibel levels of noise. Section 22a-69-3.2 (b) states: "No person shall cause or allow the emission of impulse noise in excess of 100 dB peak sound pressure at any time to any Noise Zone," but state regulations also exempt noise from sports events. Regs., Conn. State Agencies § 22a-69-3.2 (b); see also footnote 12.

[10] Dowling is also a lawyer with both litigation and corporate experience.

cated that he has increased the yearly attendance from 171,000 people to 312,000 in five years.

He stated that the prior owner had five or six fireworks shows in 1998, nine in 1999 and already had scheduled for 2000 when the Rock Cats took over. Dowling further testified that the schedule of fireworks after every Friday night home game started with his predecessor. He noted that a typical game lasts two and one-half hours and generally ends by 9:30 p.m. Once the fireworks started after 11 p.m., and on one occasion they were canceled. The fireworks are strictly regulated by the state fire marshal pursuant to General Statutes § 29-357 and § 29-357-1 et seq. of the Regulations of Connecticut State Agencies, and the parties stipulated that all fireworks shows were properly permitted.[11] The state fire marshal's office had no record of any complaints of personal injuries or property damage. The defendants maintain that there is no state noise regulation that applies to the shows.[12]

---

[11] As our Supreme Court noted in *Maykut* v. *Plasko*, 170 Conn. 310, 365 A.2d 1114 (1976), "[a]ccording to the weight of authority . . . while what is authorized by law cannot be a public nuisance, it may nevertheless be a private nuisance, and the legislative authorization does not affect any claim of a private citizen for damages . . . or for an injunction. . . . That a municipality by its zoning regulations condones certain uses is no defense to an unreasonable use constituting a nuisance." (Citations omitted; internal quotation marks omitted.) Id., 317; see also *Herbert* v. *Smyth*, 155 Conn. 78, 83, 230 A.2d 235 (1967) (operation of dog kennel, even if permitted by zoning, can constitute nuisance); *Iannicelli* v. *D & R Equipment Corp.*, Superior Court, judicial district of New Haven, Docket No. CV-97-0398549 (June 13, 1997) (*Hodgson, J.*) (granting preliminary injunction because, although defendant's use of property for soil processing business lawful within zone, it nevertheless constitutes nuisance to neighboring homeowners).

[12] Section 22a-69-1.8 (i) of the Regulations of Connecticut State Agencies exempts from the state's noise control regulations "[n]oise created by on-site recreational or sporting activity which is sanctioned by the state or local government provided that noise discharged from exhausts is adequately muffled to prevent loud and/or explosive noises therefrom." Although such noise is exempted from regulation, the regulations expressly authorize a court to conclude that a nuisance nonetheless exists. Section 22a-69-1.5 of the Regulations of Connecticut State Agencies states in pertinent part that

Dowling discussed his efforts to reduce the sound levels, acknowledging that he met with residents and city officials on different occasions in 2001 and 2002. Certain issues such as traffic control and street closings were resolved, but the noise issue remained. An attempt to relocate the Telstar site failed due to restrictions concerning wetlands and schools. The New Britain common council passed a city ordinance in 2001 requiring the fireworks to start by 10:30 p.m. He had continuing discussions with Lionel Bergeron, the president of Telstar, about reducing the decibel levels and, on the last two shows in 2004, he eliminated the salutes.[13] Dowling noted that on one occasion he received a fruit basket from Rodrigue-Baretta to thank him for reducing the noise levels.

Bergeron gave more specific details as to efforts made to reduce noise. Telstar has been involved with the city since 1977, both with the Willow Brook shows as well as the Fourth of July show that takes place at a different park. Initially, four inch shells were used but in 1988 (before the Rock Cats were involved), after complaints of debris at a nearby business, the shells were reduced in size and have remained at three inches. Telstar also uses a two and one-half inch shell, but that does not sound any different from a three inch shell, and the smoke is essentially the same. After receiving the city's letter in 2001, Telstar, with consent from the

"[n]othing in any portion of these Regulations shall in any manner be construed as authorizing or legalizing the creation or maintenance of a nuisance, and compliance of a source with these Regulations is not a bar to a claim of nuisance by any person." Common law also holds that compliance with the law is not a defense to a private nuisance claim. See footnote 11.

[13] Fireworks typically make sound three times; when detonated, at break up when the color bursts at a height of 150 to 300 feet above ground and then, immediately thereafter. The third sound is caused by the explosion of a "salute" or a "report." Bergeron testified that with the exception of a state of the art air piston system produced perhaps only for the Disney theme parks, there is no commercially available system to remove the noise upon launch or at the initial color burst.

Rock Cats, eliminated 50 percent of the "noise" from its shows; it reduced the number of salutes and replaced them with "color." It has not received any complaints from the city since that time. Bergeron testified that during 2004, Dowling called weekly, asking for a reduction of salutes; Telstar removed all the salutes for the last two shows of last season. Although both Bergeron and Dowling testified that they did not have a contract for 2005, Bergeron indicated that he has eliminated the salutes from this year's Rock Cats shows. The team's attorney also indicated that the team intends on producing the same show as it did at the end of the 2004 season.[14] Finally, Bergeron also testified that he explored producing a theatrical or ground level display, but it would not only be noisy, it would not be visible. Dowling's main argument is that the fireworks are absolutely critical to his financial success; he cites them as his most popular promotion. Fireworks shows generate twice the merchandise sales and more than twice the food sales. Attendance averages 6000 people on fireworks evenings and 3800 on other evenings.[15] Although the shows cost about $5000 each, sponsorships are sold covering the total cost. On several occasions, Dowling stated that if he were not able to have the fireworks, he would have to reconsider his commitment to New Britain. He stated emphatically that if he did not present a show, he would lose $30,000 and, thus, he would not reduce the number of shows. When asked if it was "all or nothing," he responded affirmatively. When asked about the possibility of a "noiseless" show, Dowling rejected the idea, indicating that even if available, it was not feasible because it either would be too expensive or

[14] After the trial ended, the plaintiffs filed a motion for a temporary injunction prohibiting any fireworks displays pending the final decision of this court. At the hearing on April 8, 2005, the defendants advised the court that the Rock Cats and Telstar had entered into a contract for 2005.

[15] According to attendance records, the Rock Cats drew crowds of 6000 and above on a number of games associated with a variety of promotions.

would not produce a good show. Dowling did not know what the cost would be for such a show.

The Rock Cats have been a good corporate citizen for New Britain and are involved in numerous charitable activities. Mayor Stewart recalled that in 2001, the city requested by letter that the Rock Cats reduce the noise. The common council has not had any formal discussions about the plaintiffs' complaints since 2002. He testified about the positive economic and civic benefits of having the Rock Cats in the city. He stressed that if they left it would be devastating, as the team enhances the quality of life for the citizens. Mayor Stewart indicated that although he had spoken to a number of individuals in attempts to resolve this issue, some people refuse to compromise. He noted that the fireworks are just something the residents have to endure along with the benefits derived from living close to the park and the school.

## II

## DISCUSSION

### A

The law of private nuisance was recently explained by our Supreme Court in *Pestey* v. *Cushman*, 259 Conn. 345, 788 A.2d 496 (2002): "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. . . . The law of private nuisance springs from the general principle that [i]t is the duty of every person to make a reasonable use of his own property so as to occasion no unnecessary damage or annoyance to his neighbor. . . . The essence of a private nuisance is an interference with the use and enjoyment of land." (Citations omitted; internal quotation marks omitted.) Id., 352.

"The defendants' claim is based on the principle of private nuisance law that, in determining unreasonableness, [c]onsideration must be given not only to the

interests of the person harmed but also [to] the interests of the actor and to the interests of the community as a whole. . . . Determining unreasonableness is essentially a weighing process, involving a comparative evaluation of conflicting interests . . . . Unreasonableness cannot be determined in the abstract, but, rather, must be judged under the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) Id., 352–53.

In *Pestey*, the court upheld a jury verdict that "offensive odors emanating from the defendants' farm" constituted a private nuisance. Id., 349. After discussing the differences between private and public nuisances, the court reviewed prior articulations of the elements of a private nuisance in existing case law and by the leading authorities, including 4 Restatement (Second), Torts § 822 (1979), and the classic treatise by professors W. Prosser and W. Keeton, Torts (5th Ed. 1984) § 87, pp. 622–25. The court concluded that the "proper focus of a private nuisance claim for damages . . . is whether a defendant's conduct, i.e., his or her use of his or her property, causes an unreasonable interference with the plaintiff's use and enjoyment of his or her property." *Pestey* v. *Cushman*, supra, 259 Conn. 360. The court adopted the basic principles articulated in § 822 of the Restatement (Second) and concluded that "in order to recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property. The interference may be either intentional . . . or the result of the defendant's negligence. . . . Whether the interference is unreasonable depends upon a balancing of the interests involved under the circumstances of each individual case." (Citations omitted.) Id., 361.

The *Pestey* court listed several factors to balance in determining whether an interference is unreasonable, "including the nature of both the interfering use and the use and enjoyment invaded, the nature, extent and duration of the interference, the suitability for the locality of both the interfering conduct and the particular use and enjoyment invaded, whether the defendant is taking all feasible precautions to avoid any unnecessary interference with the plaintiff's use and enjoyment of his or her property, and any other factors that the fact finder deems relevant . . . . No one factor should dominate this balancing of interests; all relevant factors must be considered in determining whether the interference is unreasonable." Id.

Finally, the court emphasized that "it is possible to prove that a defendant's use of his property, while reasonable, nonetheless constitutes a common-law private nuisance because it unreasonably interferes with the use of property by another person." Id., 359–60. Relying on *Walsh* v. *Stonington Water Pollution Control Authority*, 250 Conn. 443, 457, 736 A.2d 811 (1999), in which it held that "the production of odors by the defendants' plant could constitute a nuisance, notwithstanding the fact that operating a wastewater treatment plant was clearly a reasonable use of the property in question," the court concluded that "[t]he inquiry is cast more appropriately as whether the defendant's conduct unreasonably interfered with the plaintiff's use and enjoyment of his or her land rather than whether the defendant's conduct was itself unreasonable." *Pestey* v. *Cushman*, supra, 259 Conn. 360.

B

The facts that establish the nature, extent and duration of the interference in the present case have been discussed previously. The interfering use is a fireworks show, whose primary purpose is to entertain paying

ticketholders, and thereby improve the profitability of a business that benefits the economy and quality of life of the greater community. The use and enjoyment invaded is the plaintiffs' right to peace and quiet when in their own homes, the ability to sleep without being disturbed and the opportunity to hold a quiet conversation or watch television. They want to protect their small children from awaking scared and crying in the night and to spend their evenings not worrying about damage to their property.

These concerns are surely understandable and are what this court would expect to hear from ordinary residents living in close proximity to a fireworks launching site. See *Jack* v. *Torrant*, 136 Conn. 414, 422, 71 A.2d 705 (1950) (court may consider "the degree of discomfort which the conditions complained of would produce in the normal person"). The interference is real, significantly disrupting the plaintiffs' use and enjoyment of their property and, more specifically, their homes, at a time of day when one ordinarily expects a certain degree of peace and quiet. The extent of the interference is broad, impacting the plaintiffs' use and enjoyment through sound, smell, sight and emotions. The duration of the interference with their use and enjoyment of their property extends beyond the time required for the fireworks show itself. It is, for the plaintiffs, not simply a twenty minute event. Taking into account the blockage of streets, the time spent preparing for the noise, smoke and smell, the time required to calm a child and the inspection and cleanup of property, it lasts considerably longer.

Although the use is spatially intermittent, that is, not continuous throughout the day or night, such as the noise emanating from an air conditioner; *Nair* v. *Thaw*, 156 Conn. 445, 447, 242 A.2d 757 (1968); or the truck terminal with a peak activity period from 7 p.m. to 1 a.m.; *O'Neill* v. *Carolina Freight Carriers Corp.*, 156

Conn. 613, 615, 244 A.2d 372 (1968); or a "corn cannon" that operates from 7 a.m. to 8 p.m. at five minute intervals; *Maykut* v. *Plasko*, 170 Conn. 310, 311, 365 A.2d 1114 (1976); or an 8 a.m. to 5 p.m. topsoil processing operation; *Iannicelli* v. *D & R Equipment Corp.*, Superior Court, judicial district of New Haven, Docket No. CV-97-0398549 (June 13, 1997) (*Hodgson, J.*); it does continue on a regular basis throughout the spring and summer.[16] Fireworks are scheduled for twelve of the twenty Fridays between April 15 and the end of August, 2005; in prior years, additional Fridays were involved. In other words, the plaintiffs' use and enjoyment of their homes will be disrupted for more weekends than not for the entire spring and summer. This is not a slight inconvenience, and the plaintiffs cannot avoid it.

There is a difference of opinion as to whether this park is a suitable location for the fireworks display. Mayor Stewart, in his capacity as a fire marshal, testified that the Telstar launching site, because of its uniqueness and suitability, is used to train other fire marshals. The fireworks are shot off in the middle of a city park with, historical evidence shows, enough buffer land to prevent any property damage to surrounding homes.[17] On occasion, some plaintiffs have found a small amount of paper debris but none have reported other damage to their property. The plaintiffs, of course, argue that it is not suitable because of the proximity to their homes.

This leaves us with the question of whether the defendants have taken all feasible precautions to avoid any

[16] Distinguishing between public and private nuisances, the court stated in *Pestey* v. *Cushman*, supra, 259 Conn. 357, that "showing that the condition complained of had a natural tendency to create a continuing danger, is often irrelevant to a private nuisance claim." Although not required, a continuing danger is certainly relevant to the court's inquiry into the "nature, extent and duration" of the interference. Id., 361.

[17] Although there was the report of some property damage years ago with the prior owner, since the shell size was reduced there have been no further claims, other than the paper debris.

unnecessary interference with the plaintiffs' use and enjoyment. Bergeron testified in detail as to the changes he made to his fireworks shows. He reduced the "noise," he explored alternative launch methods, and he examined the feasibility of laser and ground shows. The shell size had been reduced prior to the Rock Cats purchasing the club. The Rock Cats pay the city the cost of the fire and police department personnel required for traffic control and to protect against property damage. These efforts and these precautions, no matter how responsible and admirable, do not, however, fully address the plaintiffs' complaints of disruption: noise, smell and smoke. Assuming that the 2004 show that was subject to Brooks' test was representative of the other displays, the number of impulse noise levels in excess of 100 decibels is considerable. See *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 646–47, 646 A.2d 133 (1994) (despite measures to reduce noise, sound from quarry remained unacceptable); *Nair v. Thaw*, supra, 156 Conn. 450–51 (air conditioner continued to invade peace and quiet despite alterations). This court's view on April 15, 2005, confirmed what the plaintiffs claim, and what most people know: fireworks are loud.

The plaintiffs do not object to baseball.[18] Yet, the owner of the Rock Cats testified that he is not in the baseball business; he is in the family entertainment business. No doubt the Rock Cats could increase their profitability with even more fireworks shows. Then again, however, so could nearly every business. Yet, the shows' impact on the Rock Cats' bottom line is not and cannot be the controlling factor.[19] Most of us enjoy

---

[18] Who can?

[19] Concluding that speaker noise at a drive-in movie theater constituted a nuisance and rejecting a social utility claim, the Pennsylvania Supreme Court stated, "[The social utility claim] presupposes that the defendants are running their theatre for the social benefit of the neighborhood. But this is not in accordance with the facts. The defendants are engaged in a profitable enterprise. They charge a price for the entertainment they offer to the public

fireworks displays,[20] yet most of us do not have a fireworks display put on in our back or front yard on a biweekly basis with no control over whether, how or exactly when it will be held. In fact, many of the plaintiffs do not object to occasional fireworks shows. Rather, they object to the regular fireworks entertainment business produced by the defendants. That noise and its consequences are certainly different from the noise or impact one would expect living in their residential-commercial neighborhood—even across from a park that frequently hosts sporting events.[21]

The one feasible precaution to avoid unnecessary interference that the defendants have not embraced is a reduction of shows. Although the parties had some discussions three years ago which resolved certain issues such as traffic and led to some time restraints, the parties, and especially the city, which has competing interests at stake, have never addressed the number or frequency of the shows. This question, requiring the balancing of the competing needs of multiple parties, would have been best resolved by those who have the most at stake. Although the present case does not raise a political question as traditionally defined by that doc-

(which, of course, they most assuredly have the right to do) but they cannot for the sake of gratifying their clients bring substantial harm to people who are not clients." *Guarina* v. *Bogart*, 407 Pa. 307, 311–12, 180 A.2d 557 (1962). The court added, "The operation of the theatre is neither a public duty nor a private necessity, and if defendants cannot operate it, for whatever reason, without depriving plaintiffs of the normal enjoyment of their homes, they must abandon the enterprise altogether." Id., 312.

[20] Indeed, as noted by Judge Blue in *Lipka* v. *DiLungo*, Superior Court, judicial district of New Haven, Docket No. 407399 (March 8, 2000) (26 Conn. L. Rptr. 654): "On the day after the Declaration of Independence was signed, John Adams wrote to a friend that the event should be celebrated with 'bonfires and illuminations, from one end of this continent to the other, from this time forward, for evermore.'"

[21] See *Nailor* v. *C.W. Blakeslee & Sons, Inc.*, 117 Conn. 241, 167 A. 548 (1933) (plaintiffs living in industrial zone entitled to damages for nuisance from commercial activities).

trine, this case, like many political question cases, forces the court to recognize "that the tools with which a court can work, the data which it can fairly appraise, the conclusions which it can reach as a basis for entering judgments, have limits." (Internal quotation marks omitted.) *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 572–73, 858 A.2d 709 (2004). Specifically, the present case requires a policy determination, which, although not "of a kind clearly for nonjudicial discretion," would be better resolved by the parties whose interests are most implicated, under the leadership of the city's officials, who, after all, have been elected to be the arbiters of policy for this community. Id., 573. Because the parties have failed to seek a flexible resolution that meets the needs of all, without perhaps satisfying the desires of any, as compromises are wont to do, this court must act.

### III

### CONCLUSION

This court concludes that the defendants' actions do constitute a nuisance; the fireworks substantially and unreasonably interfere with the plaintiffs' use and enjoyment of their homes and with their families' lives on those Friday evenings from April to August. Balancing the interests involved under the circumstances of the present case, the court concludes that the severity of the interference, as it currently exists, outweighs the benefits of the interfering use, which is, fundamentally, a profitmaking enterprise that provides entertainment. Although the court recognizes and applauds the social utility of that business to the city, it is not sufficient to justify the extent to which these individual plaintiffs have suffered and will suffer the loss of the use and enjoyment of their property during the baseball season if the fireworks proceed as planned.

"A party seeking injunctive relief has the burden of proving irreparable harm and lack of an adequate remedy at law. . . . In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." (Citations omitted; internal quotation marks omitted.) *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, supra, 230 Conn. 648. "Continuing nuisances, such as the production of noise to the detriment of one's neighbor, have traditionally been considered suitable grounds for equitable relief." Id., 649. In the present case, the plaintiffs have demonstrated that the ongoing disruption of their use and enjoyment of their homes has caused an irreparable harm to them that cannot be adequately remedied at law. Loss of peace and quiet in one's home, which has traditionally been viewed as a place of refuge and comfort from the outside world, is a serious injury, the economic value of which is not readily quantified. "[W]hether damages are to be viewed by a court of equity as irreparable or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary loss suffered." (Internal quotation marks omitted.) *Cummings* v. *Tripp*, 204 Conn. 67, 90, 527 A.2d 230 (1987) (injunction warranted where use of property caused plaintiff homeowners "much annoyance, personal inconvenience and irritation"). In the present case, the nature of the right injured is both ephemeral—peaceful moments lost can never be regained—and of such significance in human life that injunctive relief is appropriate.

Both sides suggest that this is an "all or nothing" case; that is, if the shows are found to be a nuisance, they must be totally prohibited. This court does not agree. In nuisance actions, "the final decision as to the scope and quantum of injunctive relief rests in the discretion of the trial court." *Maykut* v. *Plasko*, supra,

170 Conn. 315 (upholding trial court's rejection of alternatives to full injunction); see *O'Neill* v. *Carolina Freight Carriers Corp.*, supra, 156 Conn. 616–17 (upholding injunction limiting certain activities at truck terminal between 11 p.m. and 6 a.m. as proper exercise of discretion); J. Purver, annot., "Modern Status of Rules as to Balance of Convenience or Social Utility as Affecting Relief from Nuisance," 40 A.L.R.3d 601, §§ 2, 5 (1971) (describing cases in which, as alternative to granting full injunction, courts seek to minimize objectionable features while permitting defendant to continue activity).

Although the harm to the plaintiffs is significant, the plaintiffs are not the only ones with something at stake. The benefits that the Rock Cats bring to New Britain cannot and should not be easily dismissed. The fireworks do generate revenue for the Rock Cats, which, as noted, flows to various other entities and persons. Other than the current dispute, the Rock Cats clearly generate good will and are an important asset to the city. Moreover, "[t]he determination of whether the interference is unreasonable should be made in light of the fact that some level of interference is inherent in modern society. There are few, if any, places remaining where an individual may rest assured that he will be able to use and enjoy his property free from all interference." *Pestey* v. *Cushman*, supra, 259 Conn. 361. Yet, every Friday night home game is simply too much of a burden to place on those citizens who reside next to the park. Accordingly, assuming that the elimination of the salutes and reports and the other precautions, as testified to by Bergeron and Dowling, remain in effect, the defendants are hereby ordered to reduce the number of shows during the season to one time each month.

The plaintiffs have also asked this court to award damages for the inconvenience and disruption to their

lives.[22] This court has already discussed how the fireworks have impacted the plaintiffs. Yet, on the basis of the evidence at trial, this court concludes that the primary concern of the plaintiffs is the future, and a change to a quieter spring and summer. That is accomplished by the injunctive relief.[23] In light of that fact, and recognizing that the plaintiffs are entitled to dam-

[22] The defendant city of New Britain would not be liable for damages as a matter of law because General Statutes § 52-557n (b) (7) grants immunity to municipalities for injuries arising from "the issuance . . . of . . . any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance . . . constitutes a reckless disregard for health or safety . . . ." The issuance of a permit for a fireworks show certainly requires the exercise of judgment that is the hallmark of a discretionary act. See *Lombard* v. *Edward J. Peters, Jr., P.C.*, 252 Conn. 623, 628, 749 A.2d 630 (2000) ("[t]he hallmark of a discretionary act is that it requires the exercise of judgment."); *Duffy* v. *Wallingford*, 49 Conn. Sup. 109, 118, 862 A.2d 890 (2004) (immunity applies to discretionary act of issuance of building permit).

Although the plaintiffs also allege that the city contributed to the nuisance by providing members of the fire and police departments to oversee the fireworks, these acts do not constitute the positive acts of creation required to abrogate the municipality's immunity. See General Statutes § 52-557n (a) (1) (C) (municipality may be liable for "acts . . . which constitute the creation or participation in the creation of a nuisance"); *Keeney* v. *Old Saybrook*, 237 Conn. 135, 164, 676 A.2d 795 (1996) (town not liable for common-law nuisance unless created by some positive act of town).

The police are paid by the Rock Cats and attend the games for purpose of controlling traffic and crowds. The fire marshal attends the show and is paid by the Rock Cats for doing so because state law requires it. See Regs., Conn. State Agencies § 29-357-12b (a). Finally, a fire engine with personnel who are already on call routinely attends the shows, but its presence is not required for the fireworks to proceed. The engine continues to be available for other fire emergencies, and its presence at the fireworks does not impose any cost on the city. Neither the presence of the police nor the firefighters constitutes a positive act leading to the nuisance because the fireworks may proceed without them. The presence of the fire marshal is required by state law and is not a positive act creating the nuisance sufficient to abrogate the city's immunity.

[23] "Also, it is not alone tangible physical injury and damage which equity regards; so far as one's enjoyment of his land is affected, it is a destruction, if not physical, yet at least in the character in which it has been held and enjoyed, of what is generally regarded in equity as property so peculiar as not properly to be made a subject of compensation." *Sisters of St. Joseph Corp.* v. *Atlas Sand, Gravel & Stone Co.*, 120 Conn. 168, 177, 180 A. 303 (1935).

ages for their discomfort and annoyance,[24] damages of $100 per plaintiff are accordingly awarded, in addition to permanent injunctive relief, as discussed previously, which is effective immediately, together with costs.

---

[24] See *Cummings* v. *Tripp*, supra, 204 Conn. 90; *Filisko* v. *Bridgeport Hydraulic Co.*, 176 Conn. 33, 41, 404 A.2d 889 (1978); *Herbert* v. *Smyth*, 155 Conn. 78, 84, 230 A.2d 235 (1967).