### THE WHITE SANDS BEACH ASSOCIATION, INC. *v.* MARY BOMBACI ET AL.*

Superior Court, Judicial District of New London
File No. CV-04-568713

---

* Affirmed. *White Sands Beach Assn., Inc.* v. *Bombaci*, 287 Conn. 302, 950 A.2d 489 (2008).

Memorandum filed December 15, 2006

*Kepple, Morgan & Avena, P.C.,* for the plaintiff.

*Jozus, Milardo & Thomasson,* for the defendants.

HON. JOSEPH J. PURTILL, JUDGE TRIAL REFEREE. This is an action by the plaintiff, The White Sands Beach Association, Inc. (White Sand),[1] a quasi-municipal corporation within the territorial limits of the town of Old Lyme, to foreclose tax liens on the property of the defendants, Mary Bombaci, Frank LaBella, Francis LaBella, Jr., Mary L. Green, Joseph W. LaBella and John L. LaBella.

The matter was reached for trial on October 18, 2005, when, in open court and on the record, the parties entered into a stipulation that the case should be bifurcated as follows: a judgment of strict foreclosure was entered on the tax liens for taxes due on July 1, 2000,

---

[1] It is noted that the complaint refers to the plaintiff as White Sands Beach Association, Inc. The special act of 1927 described the entity that it purported to create as White Sand Beach. See 20 Spec. Acts 489, No. 475, § 1 (1927). In this memorandum, the corporation will be referred to as White Sand.

July 1, 2001, July 1, 2002, and July 1, 2003, with interest through September 7, 2003. A law day was set for April 15, 2006.[2] The action to foreclose the lien for taxes due July 1, 2004, was withdrawn. The issue of attorney's fees and costs in the foreclosure action should be resolved subsequent to the conclusion of the court proceedings on the remaining bifurcated issues. As a part of the stipulation, the defendants were to file an amended counterclaim by October 28, 2005, raising certain agreed upon issues. Other procedural matters were agreed to in the stipulation, which was approved by the court.

Pursuant to the stipulation, the defendants filed an amended counterclaim on October 24, 2005. The first count of the amended counterclaim sets forth claims under General Statutes § 12-119, which provides a remedy "[w]hen it is claimed that a tax has been laid on property not taxable in the town or city in whose tax list such property was set . . . ." In support of this claim under § 12-119, the defendants allege that due to its failure to follow the requirements of the special act of the legislature allowing its formation, White Sand does not exist as a specially incorporated entity. It is further alleged that due to the failure to follow the requirements of the special act allowing White Sand to annex property not originally within the territory designated by the special act, the defendants' property was not incorporated into the jurisdiction of the district and, therefore, is not taxable by White Sand. The second count of the amended counterclaim sets forth a claim under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., alleging that White Sand has engaged in unfair trade practices. The third count of the counterclaim alleges that the action of filing the tax liens in question and a lis pendens

[2] The law day was subsequently amended in accordance with an agreement of the parties.

on the land records of Old Lyme by White Sand constituted a slander of the defendants' title to their real property.

On September 20, 2005, the defendants amended counts two and three of the counterclaim, and, on November 18, 2005, White Sand filed its answer denying the essential allegations of the counterclaim. An amended answer to the counterclaim was filed by White Sand on January 12, 2006, together with two special defenses. The first special defense alleges that some or all of the claims asserted by the defendants in the counterclaim were barred by latches. The second special defense alleges that some or all of the claims raised by the defendants with respect to taxes assessed prior to October 1, 2005, were barred by the statute of limitations contained in § 12-119.

For reasons hereinafter stated, the issues on the first count are found in favor of White Sand. This is determinative of the claims alleged in the second and third counts.

The issues came before the court for trial on September 6 and 8, 2006, and briefs were subsequently filed. Matters not briefed will be considered abandoned. *Shaw* v. *Planning Commission*, 5 Conn. App. 520, 525, 500 A.2d 338 (1985).

The position of this case is somewhat unusual since we are proceeding primarily on the allegations of the counterclaim. The defendants have the burden of proof to establish the facts essential to their claims. *Nikitiuk* v. *Pishtey*, 153 Conn. 545, 552–53, 219 A.2d 225 (1966); see also Practice Book § 10-70 (b).

I

A

The first issue that must be addressed is the claim raised by the defendants under § 12-119 that their property is not subject to taxation by White Sand because

White Sand failed to follow the requirements of the special act, which allowed its formation, and, therefore, White Sand does not exist as a specially incorporated entity with the authority to levy taxes.

The General Assembly, at its January session of 1927, passed a special act entitled, "An Act Incorporating The White Sand Beach Association, Incorporated." 20 Spec. Acts 489, No. 475 (1927). This act was approved by the governor on June 22, 1927. Section 1 of No. 475 of the 1927 Special Acts provides as follows: "All owners of record of land within the limits hereinafter specified, in the locality known as 'White Sand Beach', in the town of Old Lyme, are constituted a body politic and corporate by the name of The White Sand Beach Association, Incorporated, and they and their successors shall be a corporation in law with all the privileges set forth in section 3421[3] of the general statutes, and the rights, privileges and duties hereinafter set forth."

Section 2 of No. 475 of the 1927 Special Acts set forth the territorial limits of the entity as described on a map of White Sand dated August, 1921, on file in the land records of Old Lyme.[4] Further sections of the special act granted White Sand certain municipal functions and set forth the procedures that it should follow for its administration. Section 15 of No. 475 of the 1927 Special Acts provided that the territorial limits of White Sand should constitute a separate taxing district within the town of Old Lyme. Section 17 of No. 475 of the 1927 Special Acts provided that White Sand "shall have the power to lay taxes, not exceeding the rate of seven mills per annum, upon all real property subject to tax and located within the limits of said association . . . ."

Section 22 of No. 475 of the 1927 Special Acts provided for the local ratification as follows: "This act shall

---

[3] General Statutes (1918 Rev.) § 3421 sets forth the general powers of corporations.

[4] The defendants' property was not included in the area described.

become effective upon its adoption by a majority vote of all those owners of a freehold interest of land within the limits of said association herein set forth who shall be present at a meeting called for that purpose by the clerk of The White Sand Beach Association, Incorporated, by mailing a notice of such meeting to each of said land owners, so far as the names of the same may be obtained from the tax collector of the town of Old Lyme, at his, her or its last-known address, and by posting a notice thereof on the building containing the post office at Black Hall in said town, two weeks before the time of said meeting."

In evidence are the handwritten minutes of a special meeting of White Sand called to order on Saturday, July 23, 1927, at 7:30 p.m., with eighteen members present. A communication from J. Smith was read, noted and placed on file. The minutes also reflect the following action: "Motion made and seconded that the act incorporating White Sand Beach Association be accepted and adopted. So voted." Other routine business of White Sand was then conducted at the meeting.

At trial, the defendants called as an expert witness with extensive experience in municipal law, attorney William Howard. Howard researched the formation of the corporation and looked into whether the procedural requirements set forth in § 22 of No. 475 of the 1927 Special Acts had been followed. Howard determined that there was no evidence that all of the landowners of property as shown on the 1921 map referred to in the special act had received notice of the meeting. He further testified that on the date of the meeting, there were 137 freeholders of land at White Sand entitled to notice in accordance with the special act but that only eighteen "members" were present at the meeting. Howard further testified that there was no record of compliance with the requirement that the notice of the meeting

be posted on the post office building at Black Hall two weeks before the meeting.

Because of the defects noted, Howard opined that the organizational requirements imposed by § 22 of No. 475 of the 1927 Special Acts for the formation of White Sand had not been performed. From this conclusion, the defendants argue that White Sand does not exist as a specially incorporated district authorized to levy taxes.

In the first count of their counterclaim, the defendants are claiming that in 1927, White Sand failed to perform certain acts required by the special act. "[W]hoever asserts a claim or defense that is negative in form or depends upon a negative proposition has the burden of establishing the truth of the assertion. This is only another way of saying that he or she who affirms must prove. The claim or defense of invalidity illustrates the principle under consideration, since invalidity is essentially negative in form." 1 C. Fishman, Jones on Evidence (7th Ed. 1992) § 3:25, pp. 260–61. In this regard, the defendants have introduced evidence that no proof exists that, in 1927, White Sand performed certain procedures required by the special act. There is no direct proof, however, that such acts were not performed. Assuming that White Sand's officers, acting under the special act, were acting as public officers, there is a presumption that such officers performed their duties properly. *Cahill* v. *Board of Education*, 198 Conn. 229, 242, 502 A.2d 410 (1985). This situation illustrates the problem involved in attacking the corporate existence of a quasi-municipal corporation formed almost eighty years ago.

This is basically an action to foreclose tax liens. By their amended counterclaim, the defendants have questioned the corporate existence of White Sand, a quasi-municipal corporation that is attempting to foreclose

the liens. The general law is that corporate existence cannot be attacked in a proceeding to levy or collect taxes or to enforce a tax lien. 1 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1999) § 3.52. It is a fundamental principle of law that the legality of the existence of a corporation with a de facto existence cannot be questioned collaterally. 18A Am. Jur. 2d, Corporations § 207 (2004). Connecticut basically follows the general law with respect to an attack on the validity of a de facto municipal corporation. In *Stroiney* v. *Crescent Lake Tax District*, 205 Conn. 290, 292, 533 A.2d 208 (1987), the plaintiffs sought to question the existence of a quasi-municipal corporation, claiming that certain procedural requirements imposed by the enabling statute for the formation of a tax district had not been performed. The trial court granted the district's motion to dismiss on the ground that the plaintiffs lacked subject matter jurisdiction to bring the action. Id., 291. The Supreme Court upheld the trial court, relying on "[c]ertain fundamental principles" that underlie the case. Id., 294. The principle stated was that "[a] de facto municipal corporation's existence cannot be attacked by an individual but only by the state through quo warranto proceedings." Id.

The court determined that there were three requirements for the recognition of a de facto municipal corporation. These requirements were found to be "(1) A charter or general law under which such a corporation as it purports to be might lawfully be organized; (2) an attempt in good faith to organize thereunder; and (3) an actual user of the corporate franchise." Id., 295.

In the present case, No. 475 of the 1927 Special Acts satisfies the first requirement that there be a charter or general law under which White Sand might be formed. The minutes of the meeting of the association held on July 23, 1927, indicate a good faith attempt to organize under the special act. The fact that White Sand

has functioned under the special act as a quasi-municipal corporation, assessing and collecting taxes, as well as performing other municipal functions, for almost eighty years, satisfies the third requirement of being an actual user of the corporate franchise. There is also evidence that both the state and Old Lyme have recognized the corporate existence of White Sand. It then must be concluded that White Sand is a de facto quasi-municipal corporation existing and functioning under a special act of the state and that the defendants are precluded from questioning its corporate existence.

B

As part of their allegations contained in the first count of their counterclaim, framed under § 12-119, the defendants also claim that White Sand failed to follow the requirements of No. 475 of the 1927 Special Acts allowing it to annex property not originally within the territory described in the special act. As a consequence of this failure, the defendants claim that their property was never incorporated into the jurisdiction of the White Sand district and, therefore, that such property is not taxable by it.

Section 2 of the special act describes the land included within the tax district by reference to the White Sand map recorded in the land records of Old Lyme. Section 2 of No. 475 of the 1927 Special Acts then spells out how the territorial limitations of the district may be expanded as follows: "The limits and territory of said The White Sand Beach Association, Incorporated, may be extended at any time with the consent of the voters of the town of Old Lyme, so as to include any other land adjacent thereto by the written consent of the owner of such land in an instrument describing the same and the terms of such annexation, and the acceptance of such other land as a part of said territory by said association, which consent and acceptance shall

be recorded on the records of said association and in the land records of the town where such other land shall be situated, and thereupon such other land shall be within the limits and territory of said association, and the owner or owners of such other land while they are owners thereof shall be a part of said body politic and corporate."

Section 2 of No. 475 of the 1927 Special Acts describes the territory of the district by incorporating by reference the map of White Sand in the land records of Old Lyme and provides that adjacent property may be annexed (1) with the consent of the voters of Old Lyme presumably by town meeting; (2) with the written consent of the owner of the adjacent land in an instrument containing a description of the land and the terms of annexation; (3) by acceptance by vote of White Sand; and (4) with the consent and acceptance recorded in the records of White Sand and the land records of Old Lyme.

The evidence indicates that the defendants' predecessors in title, Winfred E. Chapin and Hattie L. Chapin, who were husband and wife, acquired title to the property at 1 Seaside Lane on June 28, 1943. It also appears that the Chapins held title to the property until July 23, 1949. The minutes of a special meeting of White Sand held on September 8, 1945, indicate that property owners on the waterfront had indicated their desire to join White Sand. The minutes of a special meeting of White Sand held on September 11, 1948, contain the following: "Membership Applications—Motion was made that applications of property owners adjacent to 1948 limits seeking admission to [White Sand] be considered at this time. Application of Winfred E. Chapin, 164 White Street, Hartford, for admittance of properties 3A, 4A, 34A and 35A into [White Sand]. Motion made by Mr. Maerz that the properties which Mr. Chapin applied for membership with proper qualifications be accepted. Motion seconded by Mr. Long. Voted and so ordered

that these properties be accepted as part of [White Sand] pending approval of Town vote." The vote on Chapin's application was followed by votes on five other applications for admission.

The record of the annual town business meeting for Old Lyme duly warned and held on October 17, 1949, provides in relevant part: "Mr. E. Lea Marsh then presented a motion for [White Sand] as follows: RESOLVED: that we, the voters of the Town of Old Lyme, hereby consent that the limits and territory of [White Sand] be extended by including therein the following properties adjacent thereto: South side Seaside Lane: Lots 3A and 4A, belonging to Winfred S. Chapin." The record also states that the motion was seconded and approved at the meeting along with nine other properties.

Howard examined the records with respect to the annexation of the defendants' property into White Sand in 1948. Howard noted that on September 11, 1948, the property was owned by Winfred E. Chapin and Hattie Chapin. The minutes of the meeting indicate that only Winfred E. Chapin requested annexation, and there is no evidence that Hattie Chapin joined in this request. The parties have stipulated that they have been unable to locate any document stating that both Chapins consented to the annexation. Section 2 of No. 475 of the 1927 Special Acts requires "consent of the owner . . . ." It is claimed that consent then should be by all owners, and that Hattie Chapin's failure to consent constituted a failure in the annexation process.

For annexation, § 2 of the special act requires written consent by the owner in an instrument describing the same and the terms of annexation. Howard could find no written instrument and no description of the property to be annexed. The minutes of the White Sand meeting described the property as "[s]outh side Seaside

Lane: Lots 3A and 4A . . . ." The town meeting vote used the same description. Howard testified that there was no attempt to incorporate the lots into any map by reference to such map and, at the time, the Chapins owned approximately fourteen properties in the area. It was, therefore, he concluded, impossible to determine which of those properties was referred to in the minutes.[5]

Howard and Joseph W. LaBella both testified that they examined the land records of Old Lyme and that there was no recording of any written instrument describing the property and the terms of annexation in the land records as mandated by the special act. The parties have stipulated that no such document has been found in the land records. In this connection, Howard testified that none of the deeds in the defendants' chain of title stated that the property was subject to taxation by White Sand. In evidence is a letter from Nicholas Faniola to White Sand, dated July 28, 1950, indicating

[5] All of the lots considered for annexation were similarly described using a number and a capital letter. Ten properties, with fifteen similarly described lots, were approved for annexation at the town meeting on October 17, 1949. These number-letter designations were references to a document used by the Old Lyme tax assessor. At the time, the tax assessor used aerial photographs with property lines superimposed thereon to assist him in his duties. The number-letter designations corresponded to lots as shown on the aerial photographs. This was not an appropriate way permanently to describe property, since the aerial photographs were working documents subject to change by the tax assessor. At the time, however, the lots could be identified. The defendants dispute this and claim that it is not possible to confirm that the property described as being lots 3A and 4A on the south side of Seaside Lane belonging to Winfred S. Chapin was the property now owned by them. The evidence, however, is to the contrary. The deeds in the defendants' chain of title indicate that the property is at White Sand Beach and is on the southerly side of Seaside Lane and bounded southerly by the water of Long Island Sound. Lots 3A and 4A on the aerial photograph in evidence indicate that the lots are so bound. Nicholas Faniola and Fay Faniola, the Chapins' successors in interest, received a tax bill shortly after the annexation, and the tax assessor's records indicate that the property is within the White Sand district.

that he was confused about taxation by White Sand. In the letter he stated that he was a new resident at "White Sands" and would appreciate more information about it. It is noted, however, that the deed from the Faniolas to Josephine LaBella describes the property as being at "White Sand Beach."

It was also pointed out by Howard that at the time the town meeting participants voted to approve the annexation on October 17, 1949, the Chapins no longer owned the property, having conveyed it to the Faniolas on July 23, 1949.

Howard, who had extensive experience in the field of municipal law, testified that the annexation process, as required by § 2 of No. 475 of the 1927 Special Acts, was not followed with respect to the defendants' property. He concluded, therefore, that such property was never incorporated into White Sand. Howard contrasted the procedure followed by White Sand in connection with the Chapins' property in 1948 with the annexation of property of Roosevelt Thompson to White Sand in 1940. Thompson was represented by an attorney who meticulously followed the dictates of the special act with proper documentation and recording.

Even with the presumption favoring public officers in the performance of their public duties, it is obvious that the annexation procedures followed by White Sand in connection with the Chapins' property was flawed. The special act envisions a written instrument describing the property to be annexed and containing the written consent of the owner to be recorded in the land records. See 20 Spec. Acts 489, No. 475, § 2 (1927). Assuming that Winfred Chapin, in requesting the annexation, was acting on behalf of Hattie Chapin as well as himself and that the description of the property was adequate, there is no evidence of any written instrument. No such document was recorded in the land records as required by the special act.

It would be fair to conclude that the same cavalier procedure followed by White Sand in connection with the Chapins' property was followed in connection with the other nine properties voted in for annexation at the town meeting of October 17, 1949. From the evidence, it would appear that this was the usual modus operandi for White Sand, the exception being the Thompson annexation in 1940. And yet, White Sand continued to operate as a quasi-municipal entity with the annexed properties paying taxes and enjoying the benefits of the association until 2000, when Joseph W. LaBella, out of concern over the amount of taxes, checked the records.

The defendants correctly point out the general law concerning actions taken pursuant to a town charter or enabling act such as we have in the present case. "The charter serves as an enabling act, both creating powers and prescribing the form in which it must be exercised." (Internal quotation marks omitted.) *Palermo* v. *Ulatowski*, 97 Conn. App. 521, 525, 904 A.2d 1278, cert. denied, 280 Conn. 936, 909 A.2d 961 (2006). "Whenever the General Statutes or the municipal charter prescribes a particular procedure which by a specific act is to be done or a power is to be exercised, the prescribed procedure must be followed for the act to be lawful." *Keeney* v. *Old Saybrook*, 237 Conn. 135, 149, 676 A.2d 795 (1996). In addition to *Palermo* and *Keeney*, the defendants have cited twelve additional cases that support the general rule. All of these cases have been reviewed by the court. Although the legal principle in these cases may support the rule of law stated in *Palermo* and *Keeney*, the facts are quite different from the case at bar. These cases deal with such things as actions involving the authority to limit current taxes, personnel appointments under a charter and zone changes. None of the cases cited involve a situation, such as we have here, involving the annexation by a quasi-municipal entity that has been de facto for almost fifty years.

With respect to the annexation on September 11, 1948, involving the defendants' property and others, White Sand quotes McQuillin concerning annexation: "[A] substantial compliance with all mandatory requirements of the statutes is essential, and sometimes a strict observance is necessary. The objectives of the annexation statutes are to notify the public and protect the rights of landowners against a city's unilateral action in annexing their land. Generally, slight irregularities will not invalidate the proceedings. Annexation proceedings are presumed regular. The burden of proof is on the petitioner to show by competent and substantial evidence that the statutory requirements were in fact not met or that procedural irregularities occurred that materially prejudices [the] petitioner's substantive rights." 2 E. McQuillin, Municipal Corporations (3d Ed. Rev. 2006) § 7.39.21.

In the annexation of the defendants' property, the objectives stated by McQuillin were met. The town meeting action constituted a notification to the general public, including Hattie Chapin and all affected property owners. The rights of landowners were protected because, as the minutes of the meeting confirmed, the annexations were at the request of the property owners. There was, however, only partial compliance with this requirement because, as noted, there was no mention of Hattie Chapin's acquiescence in the annexation. There is, however, no evidence that the procedural irregularities in the annexation materially prejudiced the defendants or any of the other owners of real property in the White Sand district. The situation has existed without litigation since 1949. The defendants' only claim of prejudice is that their property was not properly annexed into the White Sand district.

White Sand, which raised the issue of laches in its pleadings, cites *Rocky Hill Inc. District* v. *Hartford*

*Rayon Corp.*, 122 Conn. 392, 190 A. 264 (1937), in support of its claim that the defendants cannot at this late date challenge the validity of the annexation. This is an old case, but it is directly on point and has never been overruled. The cited case was an action by a quasi-municipal corporation to collect four years of back taxes from the defendant. Id., 394. A special defense was interposed, claiming that the defendant's real property was not included within the survey describing the territorial limits of the district. Id. The defendant contested the inclusion of its property within the district from the start and refused to pay the taxes assessed against it, but took no action to have the taxes declared illegal. Id., 398. In preventing the defendant from raising this claim, the court stated: "Manifestly serious public inconvenience, confusion and injury would result from an adjudication, now, excluding the defendant's property from the district, which could have been avoided had the defendant asserted its claim thereto with reasonable promptness." Id. The court then included the following quotation: "Every applicant to a court whose claim, if granted, must invite consequences of such serious import should be held to have waived his right to make such a contention where he has had a fair opportunity to make it and failed to avail himself of it and thereafter rights, public or private, have intervened which will be prejudiced if the applicant shall succeed. *Coombs* v. *Larson*, 112 Conn. 236, 246, 152 [A.] 297 [1930]. This principle is as applicable to cases of inclusion of property within the limits of a municipal corporation in its formation as it has been held to be in cases of subsequent annexation. 1 [E.] McQuillin, Municipal Corporation[s] (2d Ed.) § 306. If a taxpayer were permitted to long acquiesce in [an] order of annexation and then secure its overthrow, great confusion would ensue and much injustice be often done. High considerations of public policy require that a taxpayer who is notified

that a public corporation claims to have extended its limits so as to take in his property should act with promptness and proceed with diligence, if he would resist the attempted annexation. *Strosser* v. *Fort Wayne*, 100 Ind. 443, 449 [1885]; *Kuhn* v. *Port Townsend*, 12 Wash. 605, 614, 41 [P.] 923, 29 L.R.A. 445 [1895]; *Black* v. *Brinkley*, 54 Ark. 372, 15 S.W. 1030 [1891]; *Rural Special School Districts* v. *Ola Special School District*, 182 Ark. 197, 31 [S.W.2d] 129 [1930]." (Internal quotation marks omitted.) *Rocky Hill Inc. District* v. *Hartford Rayon Corp.*, supra, 398–99.

The ruling in *Rocky Hill Inc. District* is determinative of the annexation issue raised in the first count of the defendants' counterclaim. See also *Scoville* v. *Mattoon*, 55 Conn. 144, 148, 10 A. 511 (1887). If the defendants were allowed to contest the annexation made more than fifty years ago, "great confusion" and "injustice" would result. *Rocky Hill Inc. District* v. *Hartford Rayon Corp.*, supra, 122 Conn. 398. The status of not only the defendants' property but also the other properties annexed with it and probably countless other properties within the White Sand district would be affected. There would be great uncertainty on the part of many property owners now content within the district. The assessment and collection of taxes by White Sand as well as the performance of its other municipal functions would be greatly impeded and the legislative purpose embodied in No. 475 of the 1927 Special Acts would be thwarted.

C

For the reasons stated previously, the issues on the first count of the counterclaim are found for White Sand.

II

The second count of the amended counterclaim alleges unfair or deceptive trade practices in violation

of CUTPA. In view of the determination on the first count, the issues must be found against the defendants on the second count.

### III

The third count of the counterclaim alleges that by filing the certificate of lien and the lis pendens in the land records of Old Lyme, White Sand has slandered the defendants' title to their real property. In view of the determination on the first count, the issues on the third count must be resolved against the defendants.

Accordingly, judgment is entered in favor of White Sand against the defendants.